**UNITED STATES of America, Appellee,**

v.

**Ramon RICO et al., Defendants.**

**. Appeal of Carlos ORTIZ, Appellant.**

**No. 445, Docket 78–1321.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 12, 1978.

Decided March 2, 1979.

Shira A. Scheindlin, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., and Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

David W. McCarthy, Glen Cove, N. Y., for appellant.

Before TIMBERS and MESKILL, Circuit Judges, and DOOLING,* District Judge.

---

* Of the Eastern District of New York, sitting by designation.

1. When defendant entered his plea of guilty, he reserved his right to appeal from the decision denying his motion to suppress and the Government agreed to the reservation; Judge Weinstein did not object, but expressed no view on the validity of the reservation. Such appeals have been qualifiedly sanctioned in this circuit since *Jaben v. United States,* 1965, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345, aff'g. 8th Cir. 1964, 335 F.2d 535, 538. See, *e. g., United States v. Doyle,* 2d Cir. 1965, 348 F.2d

DOOLING, District Judge:

The appeal presents another instance in which persons arriving at an airport were made the subjects of an "investigative stop" on the suspicion that they were couriers carrying drugs from a "source city" to a "recipient" city, in this case from Chicago to New York. Appellant and his co-defendants, arrested at LaGuardia Airport on January 25, 1978, moved to suppress the physical evidence seized from them at the time they were stopped and arrested, and, when that motion was denied after an evidentiary hearing, appellant entered a plea of guilty to the second count of the indictment; the count charged him with the. knowing possession of heroin with the intent to distribute it.[1] Appellant's co-defendants Ramon Rico and Gloria Mateos have not appealed.

Gerard Whitmore, a special agent of the Drug Enforcement Administration of the Department of Justice, was on duty at LaGuardia Airport on January 25, 1978, as one of a detail of special agents maintaining surveillance of flights arriving at the New York airports from such narcotics "source cities" as Los Angeles and Chicago. He had had a year's experience at John F. Kennedy International Airport, while in the Customs Service, spotting smuggling suspects by observing their patterns of unusual conduct in, and in their approach to, the inspection areas. In addition, he had observed the method used by the narcotics surveillance detail at Detroit Airport, and had participated in a four day seminar in Washington where agents from all the airports reviewed their surveillance programs and were instructed in the characteristics that might

715; *United States v. Rothberg,* 2d Cir. 1973, 480 F.2d 534; *United States v. Faruolo,* 2d Cir. 1974, 506 F.2d 490; *United States v. Burke,* 2d Cir. 1975, 517 F.2d 377, 379; *United States v. Fury,* 2d Cir. 1977, 554 F.2d 522, 524, fn. 2; *United States v. Coyne,* 2d Cir. 1978, 587 F.2d 111, 115. The cautions of *United States v. Mann,* 2d Cir. 1971, 451 F.2d 346, seem not to have been treated as imperatives. *Cf. United States v. Selby,* 2d Cir. 1973, 476 F.2d 965. Note *United States v. Nooner,* 10th Cir. 1977, 565 F.2d 633, 634.

indicate that a person was carrying heroin. In late 1976 he was assigned to the detail concerned with identifying domestic narcotic couriers. The surveillance detail watched about ten or twenty of the thirty-seven flights arriving daily in New York from Chicago. On the day of appellant's arrest Whitmore had watched two earlier flights arriving from Chicago, and had seen some two hundred people deplane from them, none of whom aroused his suspicion; he did not stop or follow any of the passengers from those flights.

When American Airlines flight 208 arrived, Whitmore was in the lounge area at the arrival gate within twenty-five or thirty feet of the doorway through which the passengers emerge from the plane and proceed in single file to the terminal wing, where they turn right to go to the baggage claim area. Whitmore noticed appellant's co-defendant Rico first, Hispanic in appearance, looking about him and into the lobby when he deplaned, and then turning around as if looking for people in the waiting area. Whitmore walked into the wing corridor area and watched Rico leave the wing area. Whitmore's attention was than attracted to appellant's co-defendant Mateos; she was walking oddly, as if she had an impairment, was looking about the area, walking slowly and tugging uncomfortably at her slacks; she was eight to twelve passengers behind Rico; she seemed to be trailing behind a man in a white raincoat, later identified as appellant. None of the three was dressed in an unusual way. In the baggage claim area appellant and Mateos took seats together. Rico went to the baggage carousel and waited. Whitmore stood next to where appellant and Mateos were sitting. Whitmore could see Rico, unlike appellant and Mateos, constantly looking at the other passengers, nervously looking about the baggage claim area; Rico was at first carrying his black leather jacket on his arm, although the Terminal Building was cold; then he put his jacket on. Appellant rose, and Whitmore took his seat, next to Mateos. Appellant looked round, and Whitmore said to him "I'm sorry, did I take your seat?" Appellant answered, "It's okay. I am just here to meet my sister." Whitmore thought the volunteered explanation odd. The baggage was delayed, and appellant first went out of the building but looked back into it through the glass wall partition, and then re-entered, went to Rico and spoke to him in Spanish. Rico took out his ticket envelope and displayed two baggage stubs to appellant, who nodded. Whitmore had, meanwhile, got up and was standing at the line of telephone booths. After a time Rico approached Whitmore and asked him where there was a water fountain. Whitmore said that he too wanted a drink and he led Rico to the fountain. Turning back, Whitmore noticed that appellant had followed Rico, and Mateos rose from her seat and watched appellant. Rico returned to his position near the carousel, appellant behind him; Mateos was outside the baggage claim area, in a sort of hallway leading to the exit. When the baggage arrived, Rico picked from the carousel a black bag that, contrary to federal regulation, had no tag on it showing the owner's name and address, and set it down next to appellant; Rico then picked a tan vinyl bag from the carousel; the bag had no personal identification tag but did have a substitute airline tag. Rico turned, nodded toward appellant, who then left the baggage claim area carrying the black bag. Rico went behind appellant to the edge of the claim area. Appellant turned, nodded to Mateos and left the building, followed by Mateos, who was followed by Rico, who seemed to lag behind the others; Mateos kept turning back toward Rico, beckoning him to catch up. Appellant did not go to the regular American Airlines taxicab stand but went into the street, trying vainly to wave down a passing taxicab. Then appellant turned toward the United Air Lines Terminal where there was a clearly visible taxicab stand, and, without returning to the sidewalk, walked quickly toward that stand; Mateos and Rico followed, Rico looking back constantly while trying to keep up with the appellant and Mateos, almost tripping at one point. At the taxicab stand the three together went to one taxicab, pointed out by the

dispatcher. At that point Whitmore went up to them, exhibited his credentials, and identified himself as a Federal narcotics officer.

■ The substantial question in the case is whether Special Agent Whitmore at this point had a sufficient basis for stopping appellant, Rico and Mateos and questioning them: what developed from the investigative stop could not justify it.

When he stopped the three, Whitmore asked them if they spoke English; appellant and Rico said that they spoke a little; Mateos indicated that she did not understand English. Whitmore asked the three whether they would mind showing him identification and an airline ticket. Appellant said that he had no ticket, that he was there to meet his sister. Whitmore, seeing that their talk was holding up others at the taxicab stand, asked the three if they would go into the building where the light was better and they would be out of the flow of traffic. Appellant and the others assented, and all four reentered the terminal building. Appellant put his suitcase on a seat and opened it, saying, "I have nothing." Whitmore saw appellant at the same time tear the airline baggage tag from the handle of the suitcase and drop it to the ground. Whitmore picked up the tag and asked appellant what it was, and appellant said that he didn't know. Before searching appellant's bag Whitmore explained that he had no right to search it without a warrant without appellant's permission, and appellant gave him the permission. Nothing incriminating was found in the bag, and appellant produced a Social Security card as identification. Rico then produced an airline ticket on request, pointing out that his name was misspelled on the ticket, and a satisfactory identification card. With the help of appellant, acting as an interpreter, Whitmore read the "*Miranda*" rights to Rico, explained that Rico could require that Whitmore obtain a search warrant before searching Rico's suitcase, and obtained Rico's consent to search. In the bag Whitmore found a plastic bag containing a brown powdery substance that looked to

him like heroin. He asked Rico what it was and Rico said that it was nothing. At that point Whitmore advised the three that they would have to go with him to the police desk, which was at least three quarters of a mile away, and took them outside to obtain police assistance. As Whitmore was talking to a police officer, he saw appellant drop a blue American Airlines ticket folder. Whitmore picked it up. It contained tickets and boarding passes for P and M Lopez. At the police desk the three were again given their constitutional rights. The bag of brown powder from Rico's bag was field-tested and it was negative for heroin. Rico said, "I told you it's nothing", when Whitmore told him that the powder was not heroin. Whitmore asked Rico what he was going to do with the powder and he answered, that he meant to sell it on the street for a few dollars, that he had no money except ninety-one cents and that that was why he was with the others, to take a taxi. Whitmore than told appellant that he wanted to search him for contraband and explained that the "rights" he was having him read to the others applied to him as well. A superficial search of appellant disclosed no contraband; he did have in his pocket some packages of the kind of American Airlines soap normally used on the aircraft. At this point a Spanish speaking special agent appeared and he read the rights to the three in their own language, and made the search warrant explanation. Mateos consented to a search, and she was found to be carrying five plastic envelopes of heroin. When appellant learned this, he appeared to be incensed with her and accused her of putting him to shame. Questioned, Mateos said that the heroin was hers, that appellant and Rico were not involved, that she had just met them on the plane and that the name used on the airplane ticket was her mother's name. All three were then formally arrested. Search of appellant after arrest disclosed that he was carrying three ounces of heroin concealed in his underclothing.

Apart from direct examination of the observed circumstances that led to the investigative stop to see if they genuinely sufficed to arouse a suspicion of wrongdoing justify-

ing immediate police inquiry, it is argued that justification of the stop is reinforced by the special agent's noting correspondence between the observed conduct of the three travellers and a set of characteristics, a "profile" derived from experience, and by the special agents' own surveillance experience. The analysis in *Terry v. Ohio*, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, assumed that not every questioning of a citizen by a policeman constitutes a seizure that requires Fourth Amendment scrutiny (392 U.S. at 19, footnote 16, 88 S.Ct. 1868); a "seizure" occurs only when the policeman "by means of physical force or show of authority, has in some way restrained the liberty of a citizen" (*ibid.*). "[T]he voluntary cooperation of the citizen" (392 U.S. at 11, 88 S.Ct. at 1874), if not much discussed, has a customary function in initial encounters between the citizenry and a well-ordered police. But *Terry* is clear that the investigative stop that rests on the constraint of a show of authority is a seizure and must meet Fourth Amendment standards; the police officer (392 U.S. at 21–22, 88 S.Ct. at 1880)

". . . must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? . . . Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." (Footnote numerals and footnotes omitted.)

The Court's contrasting articulable facts with inarticulate hunches emphasizes the Court's insistence that the basis of the police action must be such that it can be reviewed judicially by an objective standard. *Terry* did not, however, decide that the initial encounter in that case amounted to a "seizure", but in considering the justification for the invasion of personal security involved in the search of Terry for weapons, the Court did conclude, as the evidence amply required, that the policeman's observations made the case one of those in which (392 U.S. at 22, 88 S.Ct. at 1880)

". . . a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest."

*Adams v. Williams*, 1972, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, applied *Terry* in supporting the action of a police officer in accosting a parked motorist on the tip of a familiar informer and seizing a pistol from the motorist's waistband. The Court characterized the policeman's action as "an intermediate response", intermediate, that is, between formal arrest and non-action, saying (407 U.S. at 146, 92 S.Ct. at 1923):

"A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

In *Adams v. Williams* the police action was taken in a high-crime area and the tip was that the individual seated in the parked car was carrying narcotics and had a gun at his waist. Similarly in *United States v. Magda*, 2d Cir. 1976, 547 F.2d 756, a uniformed police officer observed two men make an exchange and saw one glance at him and walk rapidly away; the area, as the police officer knew, had a high incidence of narcotics dealings; these circumstances were held to justify the policeman's investigative stop of the second man when he passed the policeman. The Court, of course, relied on

*Terry* and *Adams v. Williams. United States v. Oates,* 2d Cir. 1977, 560 F.2d 45, 59, in sustaining an investigative stop on the authority of *Terry* and *Magda,* gave particular emphasis to the gravity of the suspected offense as a factor in evaluating the governmental interest motivating the stop and determining its scope. And *United States v. Riggs,* 2d Cir. 1973, 474 F.2d 699, had earlier supported an investigatory stop based on very specific information compatible with the suspect's being a known major narcotics dealer, travelling under an alias, and in possession of a large amount of currency carried in a brown paper bag.

■ Whitmore's observations up to the moment he stopped appellant and his co-defendants at the taxicab stand narrowly sufficed under the authorities to justify him in stopping the three, identifying himself as a federal narcotics officer and asking them to show him airplane tickets and identification. Whitmore's recognition that the three were travelling together but did not openly associate their activities, appellant's needlessly volunteered and evidently false statement that he was at the airport to meet his sister, the absence of identification tags on the bags that Rico took from the carousel, Rico's constant looking behind him as he went from the arrival gate to the baggage claim area, his constant looking about the baggage claim area, his looking back constantly as he trailed after the other two en route to the taxicab stand, and Mateos's suspiciously awkward walk, all these observations united to arouse the rational inference that the three were bent on concealing their association and avoiding surveillance, and that appellant did not wish it to be thought that he had just arrived at the airport from another city. Appellant's answer to Whitmore's request was the palpably false statement that he had no ticket because he had only been at the airport to meet his sister.

Appellant argues that the actions of the three travellers did not exhibit departures from the ordinary and expectable that were distinctively suggestive of criminal conduct, and argues further that Whitmore acted not on "articulable," observed data that were objectively suggestive of wrongdoing, but rather acted on an individual and subjective impression projected upon data that were objectively neutral. Appellant argues, finally, that the set of identifying characteristics (or "profile") that Whitmore outlined is made up of innocuous characteristics, not all of which were present in the case of the three travellers, that the Government offered no substantial proof of the empirical or other basis of the profile, and that its uncertain content and arbitrary application deprived it of reliability. But in this case, whether or not Whitmore consciously used the "profile" as a frame of reference as he watched the three travellers, he saw and convincingly described conduct that in aggregate warranted a man of reasonable caution in believing that it was appropriate for him to identify himself to the three and ask them to produce their tickets and some identification.

It is indeed correct that the set of characteristics outlined by Whitmore had little specifiable content. The characteristics he listed were (a) not carrying luggage, (b) trying immediately to leave the airport, (c) being extremely nervous (because of their knowledge that surveillance details were on the lookout for narcotics couriers), (d) looking around to see if they were being followed, (e) dressing differently from the pattern of dress usual on Chicago to New York flights, (f) carrying luggage without the identification tags required by federal regulations, and (g) acting as if they were travelling separately when in fact they were travelling together. Plainly the first two characteristics are a linked pair and alternative to the sixth: only if without luggage could the suspect hurry out of the airport; there could be no question of untagged luggage. Visible nervousness is not readily described in terms that would enable the trier of the facts to verify the validity of the special agent's summary characterization. Conventionality in dress is not a characteristic of the period, if it is of those who travel by air from Chicago to New York. In the present case the only

ones of the stated characteristics present were Rico's looking about him persistently, the absence of identification tags, and the effort of the three to avoid the appearance of being together. The characteristics enumerated by Whitmore are not the same ones enumerated in the much more specific Detroit airport "profile" discussed in *United States v. McCaleb,* 6th Cir. 1977, 552 F.2d 717, 719–720, *United States v. Lewis,* 6th Cir. 1977, 556 F.2d 385, 387, *United States v. Pope,* 6th Cir. 1977, 561 F.2d 663, 666–667, fn. 3, and *United States v. Canales,* 6th Cir. 1978, 572 F.2d 1182, 1186 (footnote); the "profile" referred to in those cases, more specifically suggestive of complicity in the drug traffic, were (1) use of small denomination currency to buy airline ticket, (2) travel to and from drug import centers, (3) absence of luggage or use of an empty suitcase, (4) nervousness, and (5) use of an alias. Yet the Sixth Circuit Court has been clear that "satisfaction of a DEA drug courier profile does not necessarily satisfy the *Terry* requirement that the agent be able to point to 'specific and articulable facts' which warrant the intrusion". See *United States v. Pope, supra,* 561 F.2d at 668; *United States v. Lewis, supra,* 556 F.2d at 389; *United States v. Ballard,* 5th Cir. 1978, 573 F.2d 913, 915–916; *cf. United States v. McCaleb, supra,* 552 F.2d at 720; *United States v. Smith,* 6th Cir. 1978, 574 F.2d 882, 885. In this Circuit *United States v. Westerbann-Martinez,* E.D.N.Y.1977, 435 F.Supp. 690, 697–698, referred to a courier profile differing both from the Detroit profile and from the set of characteristics testified to by Whitmore in the present case.

■ No doubt the cumulative experience of the special agents in the surveillance details at the airports must give rise to a kind of institutional expertness that can be in part summed into a check list of recurrent traits of conduct found in narcotics couriers. But such a check list of recurrent characteristics can do no more than alert the special agent to initiate surveillance. More is required to warrant the intrusion of an investigative stop. See *United States v. Montgomery,* 1977, 182 U.S.App.D.C. 426, 430, 561 F.2d 875, 879; *cf. United States v. Floyd,* E.D.Mich.1976, 418 F.Supp. 724, 726.

The investigative stop in the instant case was justified not by reference to the "profile", which it did not measurably satisfy, but because in the circumstances and at the place where Whitmore was posted the complex of conduct that he observed and described would have made an experienced and reasonably cautious law enforcement officer suspicious that the three travellers were transporting narcotics, and have satisfied him that the appropriate and minimally intrusive course of action was to stop the travellers and ask them to produce their airline tickets and identification. The standard of reasonableness remains that of *Terry,* explained in *United States v. Oates, supra,* 560 F.2d at 59, and in *United States v. Magda, supra,* 547 F.2d at 758, and applied in *United States v. Garcia,* E.D.N.Y. 1978, 450 F.Supp. 1020, 1023–1024. See also *United States v. Taibe,* E.D.N.Y.1978, 446 F.Supp. 1142, 1146.

■ The investigative stop rapidly developed evidence sufficient to justify appellant's arrest. He denied having an airline ticket and repeated the untruthful statement that he was at the airport to meet his sister. His making a point of opening the suitcase he was carrying to show that it contained nothing incriminatory increased rather than allayed suspicion because of appellant's effort to get rid of the airline baggage tag and his denial that he knew anything about the tag. The search of Rico's suitcase, after he had been advised of his rights and had assented to the search, produced the bag of brown powder and the reasonable request that the group move to the police desk to verify Rico's assertion that the brown powder was nothing. Appellant's attempt to rid himself of the airline tickets he had been carrying and Whitmore's finding that they covered "P and M Lopez", a name different from that on appellant's social security card, combined with appellant's earlier conduct, furnished Whitmore with probable cause for arrest. The search of appellant followed his arrest and required no consent (*United States v. Rob-*

*inson,* 1973, 414 U.S. 218, 236, 237–238, 94 S.Ct. 467, 38 L.Ed.2d 427), but in fact appellant had consented to a superficial search of his person before the formal arrest, and it must be doubted that the consent to that search is divisible into a consent to a futile superficial search and a refusal of consent to an effective search. In any case, the discovery of the heroin carried by Mateos and knowledge of the way it was carried established the reasonableness of the further search of appellant.

Affirmed.