**UNITED STATES of America,**

v.

**Lillian WEBB, Defendant.**

No. 79 CR 375.

United States District Court, E. D. New York.

Nov. 21, 1979.

Edward R. Korman, U. S. Atty. by Mark
A. Summers, Asst. U. S. Atty., Brooklyn, N.
Y., for United States.

Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov by Franklin B. Velie; Gerald
B. Lefcourt, New York City, for defendant.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Defendant, Lillian Webb, is charged with violating the federal narcotics laws.[1] She has moved to suppress a statement made by her and a packet of narcotics seized from her while in custody. She contends that since her arrest was not based on probable cause all evidence obtained is tainted. A hearing was held on August 7 and 8 of 1979, and memoranda were submitted thereafter. On November 6, 1979 this court rendered an oral opinion in which it granted defendant's motions. This decision follows to elaborate upon the court's rulings.

## I. THE ARREST

On the night of June 5, 1979, Lillian Webb ("Webb") arrived at Kennedy Airport after a flight from Paris, France. After gathering her luggage, Webb approached the exit doors of the customs area at approximately 9:00 p. m. When Webb reached the doors, the customs aide, Pat Lockiby ("Lockiby") informed Webb that her customs declaration was not signed by a customs inspector. Lockiby directed Webb to return to one of the customs inspection belts for clearance. The customs clearance area was approximately 60 to 75 feet from the exit doors.

Webb turned from the exit area and walked toward the customs inspection area. However, rather than going directly to a customs inspection belt, Webb proceeded to a women's bathroom. Seeing Webb's apparent detour, Lockiby began to walk toward the bathroom. At some point between the bathroom and the exit area, a skycap expressed his annoyance to Lockiby over having to hold Webb's baggage while she was in the bathroom. Lockiby entered the bathroom through two doors which separated the bathroom facilities from the customs area. As she opened the inner door she observed an elderly woman and young child standing near a sink. She also observed Webb standing near a sanitary napkin dispenser four feet from the door.[2] Lockiby directed Webb to exit the bathroom immediately and to proceed to the nearest customs inspection belt. As Webb reached to the floor to pick up her handbag, Lockiby noticed a pink packet in a space on the tampax dispenser. Webb exited and proceeded to the customs belt.[3] Although Lockiby did not see Webb place the packet in the dispenser and could not link her to it, Lockiby signaled to Customs Inspector Lundt to observe Webb carefully, and returned to the bathroom to inspect the packet. She found another package in an adjacent slot. The two packets were pink colored condoms. Lockiby contacted another customs official, retrieved the condoms and brought them to Lundt's inspection belt.

At approximately 9:15 p. m. Drug Enforcement Agent Michael Priore ("Priore") joined Lockiby in the customs area. Lockiby related the events which had developed and showed Priore the bathroom. Priore examined the bathroom, exited it, and went to Lundt's line to examine the condoms. Although the condoms were not tested for narcotics, Priore believed through prior experience that they contained narcotics. At that point, Priore did not believe that he had even mere suspicion to conduct a customs search.[4]

After exiting, Webb stood approximately 20 to 25 feet from the bathroom door and observed the activities near the bathroom.

1. The two count indictment charges violations of 21 U.S.C. §§ 952(a), 960(a)(1) and 841(a)(1).

2. Lockiby told the case agent that Webb appeared startled by her sudden entry into the bathroom. Given the proximity of the door to Webb's position, this factor could appear to be either innocuous or suspicious. Thus, it does not materially add to a showing of probable cause.

3. The bathroom was only 6 to 8 feet from the nearest point of the customs belt. This fact diminishes the significance of Webb's detour since it was not an act in itself so colored with deliberateness as to add materially to a finding of probable cause.

4. See United States v. Glaziou, 402 F.2d 8 (2d Cir. 1968), cert. denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969).

Priore approached Webb and identified himself as an agent. Priore informed Webb that he was conducting a narcotics investigation and that Webb was observed in the area where narcotics were found. In response, Webb immediately turned toward the bathroom, and stated that she was tired, had just arrived from Bangkok, and knew nothing of narcotics. Priore's investigation was then at a level of mere suspicion.

Priore asked Lundt for Webb's passport and customs declaration. Priore noticed that the customs declaration indicated that Webb had arrived from Paris, France. Moreover, Webb's passport was newly issued in Paris one week prior to June 5, 1979.

At that time, Lundt suggested that they move to a secondary customs inspection area, a private search area adjacent to Lundt's customs inspection belt. Lundt, Priore and Webb walked to that area. As they left the primary customs area, Priore inquired about Webb's airplane ticket. Webb indicated that she did not have it with her. At that point, although Webb was not formally under arrest, she was not free to go.

In the secondary inspection room, Lundt continued with his examination of Webb's baggage on a table in that room. Lundt also brought the two condoms and placed them on that table. Priore informed Webb that she was a suspect in his investigation and informed her of her rights. Although Webb was an Australian lawyer, Priore indicated that he wanted to insure that she understood her rights in the United States. Webb responded that she understood them. Priore again asked for the airline ticket, and Webb told him that she discarded it on the airplane. Webb also informed him that her original passport had fallen into a puddle, and that because she believed it to be unpresentable, obtained a new one. When asked about narcotics Webb denied any knowledge of them.

Priore observed that Webb appeared unhealthy. Webb informed him that she had suffered from dysentary from December of 1977. She also told him of her psychiatric problems and the partial paralysis of her arm. Nevertheless, Priore believed that she looked like a narcotics addict.

During this time, Lundt found a small scale marked in carats and grams in Webb's suitcase. Webb stated that she used the scale to weigh beads, jewelry and diamonds which she bought and sold during her travels as a means to support herself.

At approximately 10:00 p.m., Priore left the secondary room to call his supervisor. Priore told his supervisor that packets containing what appeared to be narcotics were discovered, that he was suspicious of a passenger and that when he ascertained more facts he would contact the United States attorney to obtain approval for a continuing investigation.

When Priore returned about eight minutes later, he again asked Webb about narcotics and received her denial of knowledge. He then told her that he would submit the condoms for fingerprint analysis. Priore was then informed that Webb had touched the condoms in the presence of and with the knowledge of Lundt. No further questioning ensued and no further efforts were made to obtain fingerprints from the tampax dispenser. Priore conducted a field test of the condoms and found that they contained heroin. Priore left the room at approximately 10:15 p.m. to call Assistant United States Attorney ("AUSA") Appleby. When Priore returned he placed Webb under arrest and informed her of her rights.

At that point, Lundt ordered a personal body search of Webb. Webb removed all her clothes and her body was examined. She was also told to bend over and spread her buttocks. The strip search revealed no narcotics.

Throughout, Webb denied any knowledge of narcotics, although she was questioned frequently about their existence. After the arrest and strip search she was taken to a processing office between 10:30 and 11:00 p.m. by three agents of the DEA.

The Government contends that the following factors lead to a showing of proba-

ble cause: (1) the defendant had attempted to leave the customs area without inspection; (2) when told to return for inspection the defendant proceeded to the ladies room; (3) the defendant stood near the sanitary napkin dispenser in which the heroin was found; (4) the defendant stated that she was travelling from Bangkok although her flight came from Paris; (5) the defendant turned toward the bathroom when informed that narcotics had been discovered; (6) the defendant had a newly issued passport; (7) the defendant discarded her airplane tickets; (8) the defendant looked like a narcotics addict; (9) the defendant had a scale; (10) the defendant "deliberately" touched the packets.

The defendant claims that these factors were innocent when considered in their factual context and were insufficient to support a showing of probable cause. She contends that there was no evidence amounting to probable cause to arrest.

■ The standard for probable cause is well settled. "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that 'an offense has been or is being committed.'" *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). This standard was reaffirmed recently in *Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979).

Unique factual determinations in the context of the nation's drug enforcement activities arise in support of and in challenges to findings of probable cause. Drug enforcement agencies, among them the DEA, have developed new methods for coping with a growing drug trade and the imaginative efforts of drug dealers and couriers. One method used to identify potential narcotics violators is a loosely compiled set of factors known as a drug courier profile. *See e. g.,*

*United States v. Asbury*, 586 F.2d 973 (2d Cir. 1978).

■ While the characteristics which make up a profile may establish a sufficient basis for a customs or border search, *see United States v. Asbury*, 586 F.2d 973 (2d Cir. 1978), or a "stop and frisk" under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *see United States v. Rico*, 594 F.2d 320 (2d Cir. 1979); *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977); *United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977), they are not sufficient alone to establish probable cause. For example, in *United States v. Rico, supra*, the profile and other factors gave the investigating officers a reasonable basis for an investigative stop. As a result of that stop, the officers found sufficient evidence to support an arrest based on probable cause. 594 F.2d at 326. Similarly, in *United States v. Asbury, supra*, the profile provided a sufficient basis for a finding of mere suspicion, but not a finding of probable cause. Only after the customs search was conducted and the incriminating evidence seized did the officers make a sufficient showing of probable cause to justify the arrest. 586 F.2d at 977. *See also United States v. McCaleb, supra; United States v. Westerbann-Martinez*, 435 F.Supp. 690 (E.D.N.Y.1977).

■ Here, the factors listed to show probable cause closely resemble this profile. Thus, it is clear that Agent Priore and the Government relied upon the characteristics common to a drug courier profile analysis, although they did not refer to it specifically. While Webb's actions may have led Priore to become suspicious of her, there are no facts which raised his inquiry to the level of probable cause for the arrest. *Compare United States v. Rico, supra; United States v. Asbury, supra.* Here, Webb was stopped and questioned concerning her involvement with narcotics. She maintained her innocence. While her actions and answers may have justified the stop and strip search, the strip search itself revealed no evidence of wrongdoing. Indeed, Priore himself admitted that even up until the time Webb touched the condoms

he did not believe that probable cause existed. Rather, he expressed his desire to continue the investigation and to gather evidence against Webb. Yet, as the facts clearly indicate, no further evidence developed which linked Webb to any crime.

While an examination of the factors listed by the Government resemble many used in *United States v. Asbury, supra,* it is clear that they do not, singly or in combination, support a finding of probable cause. While the Government's contentions may be appropriate were the legality of the stop and strip search in question, it is clear that the profile characteristics are, without more, insufficient to establish probable cause. *See United States v. Beck,* 598 F.2d 497 (9th Cir. 1979); *United States v. Mendenhall,* 596 F.2d 706 (6th Cir. 1979); *United States v. Rico, supra; United States v. Asbury, supra; United States v. Oates,* 560 F.2d 45 (2d Cir. 1977); *United States v. McCaleb,* 552 F.2d 717 (6th Cir. 1977); *United States v. Himmelwright,* 551 F.2d 991 (5th Cir. 1977), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); *United States v. Diaz,* 503 F.2d 1025 (3d Cir. 1974); *United States v. Chiarito,* 507 F.2d 1098 (5th Cir. 1975), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *United States v. Westerbann-Martinez,* 435 F.Supp. 690 (E.D.N.Y.1977).

■ The failure of the stop, questioning and strip search to implicate Webb in narcotics smuggling establishes that Webb was arrested without probable cause. Accordingly, the arrest was illegal.

## II. THE SEIZURE

Webb was taken to the DEA offices at Kennedy Airport for processing following her arrest. Processing was completed at approximately 12:00 a.m. of June 6, 1979. Webb was then transported to the Metropolitan Correctional Center in Manhattan for lodging pending her arraignment.[5]

When Webb arrived at the MCC, she proceeded through the doors to the facility. DEA Agent Huber opened a door for Webb and waited for her to pass. He noticed Webb holding a tissue. As Webb was walking toward him, he noticed her drop coins, bend down to pick them up, and simultaneously discard the tissue in a waste paper basket.

A short time later, a guard at the MCC appeared at the MCC processing station. The guard told Huber that she was standing near Webb when Webb entered the MCC. She saw Webb reach under her garments when Webb picked up the change and then discard the tissue. The officer retrieved the discarded tissue and recovered a condom. A field test indicated that it contained heroin.

The defendant contends that seizure of the packet was tainted by the prior illegal arrest, and moves to suppress it. The Government briefly argues in a footnote that the defendant's act of discarding the condom approximately three to four hours after her arrest was a significant intervening factor which dissipated any possible taint.[6]

■ Having found that Webb's arrest was illegal, the court's inquiry must turn to *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and its progeny to resolve the issue raised by the defendant. The test to be applied is "whether granting establishment of the primary illegality, the evidence to which objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 488, 83 S.Ct. at 417. In applying this test, it is proper for the court to consider the temporal proximity of the events, the presence or absence of intervening circumstances and

---

5. The log indicates that Webb arrived at the MCC at 2:19 a. m., more than two hours after processing was completed in the DEA offices. No explanation is offered for the delay in bringing Webb the relatively short distance from Kennedy Airport to the MCC.

6. Prior to rendering its oral opinion on November 6, the court inquired further concerning this issue. The Government again contended that the abandonment was a "voluntary" act which broke any chain of causality.

the purpose and flagrancy of the misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The burden of showing admissibility through dissipation rests with the prosecution. 422 U.S. at 604, 95 S.Ct. 2254.

Here, the condom was recovered at the MCC approximately three to four hours after Webb's arrest. Webb was continuously in custody. No significant intervening factor demonstrating the dissipation of the taint followed. *Compare Wong Sun v. United States, supra* (defendant's return several days after release from custody held to be significant intervening factor) *with Brown v. Illinois, supra* (giving of *Miranda* warnings to defendant in continuous custody not significant intervening factor) and *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (no intervening factor where defendant's continuous custody following illegal arrest produced sketches and statements). *Cf. United States v. McLeroy*, 584 F.2d 746 (5th Cir. 1978). Thus, the path between the illegal arrest and the subsequent seizure of its fruits is clear.

The Government contends that no cases support the defendant's position.[7] However, it is clear that other courts have found that evidence seized following an illegal arrest was inadmissible even though the evidence was discarded by the defendant. These results were reached despite the contention that the property was abandoned

voluntarily. *United States v. Beck*, 602 F.2d 726 (5th Cir. 1979); *United States v. Barber*, 557 F.2d 628 (8th Cir. 1977); *United States v. Embry*, 546 F.2d 552 (3d Cir. 1976), cert. denied, 430 U.S. 948, 97 S.Ct. 1587, 51 L.Ed.2d 797 (1977); *United States v. Newman*, 490 F.2d 993 (10th Cir. 1974); *Lawrence v. Henderson*, 478 F.2d 705 (5th Cir. 1975); *United States v. Borcich*, 460 F.2d 1391 (10th Cir. 1972); *Fletcher v. Wainwright*, 399 F.2d 62 (5th Cir. 1968); *United States v. Merritt*, 293 F.2d 742 (3d Cir. 1961); *United States v. Coleman*, 450 F.Supp. 433 (E.D.Mich.1978); *People v. Baldwin*, 25 N.Y.2d 66, 302 N.Y.S.2d 571, 250 N.E.2d 62 (1969). *See also Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); *United States v. Wilson*, 569 F.2d 392 (5th Cir. 1978); *United States v. Wynn*, 544 F.2d 786 (5th Cir. 1977).

■ The court finds this precedent to be persuasive. Here, the facts establish that Webb's illegal arrest caused the seizure of the condom at the MCC. The court finds that the Government has failed to demonstrate the dissipation of the taint through a significant intervening circumstance.[8] As a result, the condom must be suppressed.

## III. THE STATEMENT

After Huber discovered the existence of the condom, and determined that it contained heroin, he asked Webb if "there were any more." (Transcript 263) Webb re-

7. The Government relies on two cases to support its abandonment argument: *United States v. Jarvis*, 560 F.2d 494 (2d Cir. 1977) and *United States v. Galante*, 547 F.2d 733 (2d Cir. 1977). Neither case is applicable here. In *Jarvis*, the police had probable cause to make the arrest. 560 F.2d at 498. In *Galante*, the voluntary cooperation of one of the participants dissipated the taint. 547 F.2d at 741.

8. The three or four hour lapse in time between the arrest and seizure is not a significant intervening factor by itself since defendant was at all times in custody and subjected to questioning. For example, in *United States v. Borcich, supra*, the court, after reviewing the standard set forth in *Wong Sun v. United States, supra*, noted:

> The trial court here found that the primary taint of Borcich's arrest was not purged at the time he threw the tin of marihuana from

the truck. This finding was not clearly erroneous in the case at bar although [sic] *considerable lapse of time had occurred and many miles had been traveled* before the incident occurred. The trauma of Borcich's arrest and the continuing compulsion of the armed and isolated caravan would do little to free Borcich of the fear inherent in his situation. *Id.* at 1394 (emphasis added).

Webb faced a similar, if not more dramatic, traumatic situation when she entered customs, was arrested and detained for hours. She was not allowed to contact anyone. She was still not recovered from her different ailments. She was reminded that she faced the possibility of incarceration if she failed to cooperate. Under all the circumstances indicated by the record, the fruits of the seizure were come at by the illegal arrest.

sponded, "No, there were only three." (Transcript 263).

The Defendant contends that the statement was taken in violation of her rights and moves for its suppression. The Government claims that no violation occurred, and that the statement was a spontaneous declaration.

The court finds that the motion to suppress must be granted. There are two grounds for that result.

First, under a Fifth Amendment analysis, the statement was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* requires that when a person is in custody, and requests an attorney, all further questioning concerning the crime must cease. 384 U.S. at 474, 86 S.Ct. 1602. Failure to honor a defendant's request for an attorney through questioning designed to elicit further information renders any statement inadmissible at trial. *See also United States v. McCain,* 556 F.2d 253 (5th Cir. 1977). *United States v. Kinsman,* 540 F.2d 1017 (9th Cir. 1976); *United States v. Miller,* 432 F.Supp. 382 (E.D.N.Y.1977) *aff'd,* 573 F.2d 1297 (2d Cir. 1978).

Here, the record indicates that Webb requested an attorney following the arrest. While at the DEA offices Webb stated that she wanted to contact an attorney prior to cooperating or making a statement. She was given coins for that purpose by Huber, but was not allowed to make such a call at the DEA offices at Kennedy Airport although a telephone was available. Priore refused Webb's request at that time because he believed it would interfere with the DEA investigation. (Transcript 120–131). Thus, Webb was told that she had to wait until her arrival at the MCC to make the call.

Thus, the record is clear that Webb specifically requested an attorney. The agents effectively frustrated that request by denying her that right until her arrival three hours later at the MCC. Thus, *Miranda's* mandate requiring the cessation of all questioning was ignored by Huber's custodial questioning concerning the crime for which Webb was arrested.

The Government has not met its burden that Webb knowingly and voluntarily waived her right to counsel either explicitly, *see Miranda v. Arizona, supra,* or implicitly, *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Here, Webb clearly indicated that she desired to speak with an attorney before she acceded to the agents' request for cooperation. Accordingly, no waiver occurred. *See e. g. Maglio v. Jago,* 580 F.2d 202 (6th Cir. 1978).

Moreover, Webb's statement was not a spontaneous declaration. Rather, it was made in response to a direct inquiry from Huber. The condom implicated her in the narcotics violation. The questioning involved the same crime for which Webb was arrested. Thus, Webb's request for an attorney required all further questioning to cease. *Compare Michigan v. Mosely,* 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

Accordingly, for all these reasons, the statement is inadmissible on Fifth Amendment grounds.

Second, there is a question as to the admissibility of Webb's statement on Fourth Amendment grounds. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Thus, even if the statement was voluntarily made under a Fifth Amendment analysis, its inadmissibility may nevertheless be established on Fourth Amendment grounds. 422 U.S. at 601–02, 95 S.Ct. 2254. Thus, this court must determine whether Webb's statement was sufficiently an act of free will to purge the taint of the illegal stop. 422 U.S. at 602, 95 S.Ct. 2254. Again, the court must consider the temporal proximity of the arrest and statement, the presence of intervening circumstances, and the purpose or flagrancy of the official misconduct. 422 U.S. at 603–04, 95 S.Ct. 2254.

After reviewing the findings of fact already made, the court finds that Webb's

statement was not sufficiently an act of free will to purge the taint. It was made approximately four hours after her illegal arrest. *Compare Dunaway v. New York,* 442 U.S. 200, 203 n. 2, 99 S.Ct. 2248, 2251, 60 L.Ed.2d 824 (1979) (first statement made one hour after arrest, second statement made next day); *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (statement within two hours after illegal arrest); *United States v. Tucker,* 610 F.2d 1007 (2d Cir. 1979) (statements made several hours after arrest and following day). Webb was continuously in the custody of the agents, and no intervening circumstance occurred. *Compare Brown v. Illinois, supra,* 422 U.S. at 604, 95 S.Ct. 2254; *United States v. Tucker, supra* at ———. Finally, the apt cross-examination by Webb's defense counsel indicates that the agents' investigation was a continuing one. Thus, a proper inference to be drawn is that Webb's custody was needed to further the purposes of the investigation. Accordingly, the statement is inadmissible on Fourth Amendment grounds. *Dunaway v. New York, supra ; Brown v. Illinois, supra.*

The motion to suppress Webb's statement is granted.[9]

## IV. RELEVANCE

■ The defendant's final contention concerns the relevance of the two condoms seized in the ladies' bathroom at Kennedy Airport. Fed.R.Evid. 401 and 402. The Government contends that this evidence was abandoned in the bathroom. However, nothing connects the defendant to the condoms other than her presence in the bathroom. In light of this fact, and in view of the court's rulings on Webb's motions to suppress, the court finds that these condoms would be inadmissible at trial. Fed.R.Evid. 401 and 402.

9. In light of this result, the court need not reach defendant's Sixth Amendment argument under *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

## CONCLUSION

The defendant's arrest was not based on probable cause.[10] The condom seized at the MCC and the statement made must be suppressed. The two condoms seized in the bathroom are inadmissible on relevancy grounds.

So ordered.

10. The court notes that defendant's explanations as set forth in the hearing memoranda were persuasive.