UNITED STATES of America, Appellee,

v.

Maria VASQUEZ, Appellant.

No. 1197, Docket 79–1064.

United States Court of Appeals,
Second Circuit.

Argued June 8, 1979.

Decided Nov. 30, 1979.

---

* Of the Eastern District of New York, sitting by
designation.

1. For the district court's opinion, *see Munro
Drydock, Inc. v. M/V Heron*, 467 F.Supp. 513
(D.Mass.1979).

David Segal, New York City, for appellant.

Francis J. Murray, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Harvey M. Stone, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before KAUFMAN, Chief Judge, OAKES and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Maria Vasquez appeals from a judgment entered in the United States District Court for the Eastern District of New York, Thomas C. Platt, Judge, convicting her, after a plea of guilty, of one count of knowingly and intentionally using a communication facility in connection with the commission of a narcotics-related felony, in violation of 21 U.S.C. § 843(b).[1] Appellant's guilty plea was entered pursuant to a court-approved agreement preserving her right to appeal the court's denial of her motion to suppress certain evidence.[2]

The evidence that Vasquez seeks to have suppressed was seized in the course of a

---

[1.] Vasquez was sentenced to a term of four years' imprisonment, to be suspended after six months of confinement, and was placed on five years' probation. She is free on bail pending disposition of this appeal.

[2.] We have permitted appeals to be taken pursuant to such agreements in a number of recent cases. *See, e. g., United States v. Vasquez-Santiago*, 602 F.2d 1069, 1070 n.2 (2d Cir. 1979); *United States v. Price*, 599 F.2d 494, 496 n.1 (2d Cir. 1979), and cases cited therein.

Although the record is barren of any evidence indicating when or where Vasquez made unlawful use of the telephone, on the basis of Vasquez's responses during the allocution preceding acceptance of her plea, Judge Platt made a finding that there was a factual basis for that plea. Fed.R.Crim.P. 11(f).

warrantless search conducted by agents of the Drug Enforcement Administration shortly after Vasquez and Luis Flores, another passenger apparently travelling with her, arrived at La Guardia Airport on a flight from Chicago. Vasquez contends that the evidence was obtained as the result of an unconstitutional stop in the course of which the agents made an unconstitutional search. Specifically, she argues (1) that the agents lacked reasonable cause to stop and question her, and thus the evidence seized in the course of the stop must be excluded as the fruit of an unconstitutional seizure, and (2) that Flores' purported consent to the warrantless search of the luggage in his possession was not freely and voluntarily given, and thus the evidence found pursuant to that invalid consent must be excluded as the fruit of an unconstitutional search. Our review of the record compels us to reject both contentions and we therefore affirm.

## I. Background

After a two-day suppression hearing, at which the three arresting agents and an airport skycap testified, Judge Platt found the relevant facts as follows.[3] On April 4, 1978, a team of DEA Special Agents assigned to La Guardia Airport was observing passengers arriving on an afternoon flight from Chicago, which has been identified by the DEA as a "source" city from which couriers frequently transport illicit drugs to New York via regularly-scheduled commercial flights. Vasquez and Flores were the last passengers to disembark. Although they were conversing as they walked down the first ramp, they separated when they reached the corridor leading to the waiting room. As Flores proceeded to the baggage area, Vasquez trailed behind him, glancing frequently over her shoulder as she walked and, on at least two occasions, stopping to make a complete turn while surveying the other people in the terminal. During a five minute wait in the baggage claim area, Vasquez and Flores stood several yards apart, occasionally making eye contact but,

according to the agents' testimony, giving no signs of recognition. When the luggage was placed on the carousel, Flores removed two bags, neither of which bore any identification. One of the bags was secured with a small metal padlock.

After retrieving the luggage, Flores summoned a skycap. One of the DEA agents, Gerard Whitmore, then saw Flores tear two baggage claim checks off his boarding pass, giving the claim checks to the skycap and returning the boarding pass to his pocket. When the skycap inquired as to Flores' destination, Flores initially responded "Brooklyn," but after being corrected by Vasquez, Flores again addressed the skycap and said "the Bronx." After this exchange, Vasquez again moved away from Flores. As the skycap led the way to the taxi-stand, Flores followed him closely while Vasquez followed Flores at some distance.

When the skycap began to load the luggage into a taxi, Agent Whitmore identified himself as a federal narcotics agent and asked the skycap to hold up for a moment. According to the skycap's testimony, this request was made in a quiet and polite manner. Agent Whitmore then addressed Flores, asking whether he spoke English. Flores responded in the affirmative. Agent Whitmore then asked if he could see Flores' airline ticket and some identification. In response, Flores produced a driver's license but said that he did not have an airline ticket. Agent Whitmore then asked Flores whether the two bags were his. Flores did not reply but the skycap handed the two claim checks to Agent Whitmore. At this point Agent Sears, who along with Agent Trustey had been questioning Vasquez while Whitmore spoke to Flores, informed Agent Whitmore that Vasquez had produced no identification but had stated that her name was Maria Vasquez, that the luggage was not hers, and that Mr. Flores had her airplane ticket. Agent Whitmore again asked Flores for the tickets and in response Flores showed him two consecutively numbered tickets made out to "Mr. and Mrs. Alcaide." The tickets, purchased for cash

---

**3.** *See* Judge Platt's memorandum and order, 462 F.Supp. 702 (E.D.N.Y.1978).

on that very day, were both one-way from Chicago to New York.

Agent Whitmore again asked Flores whether the luggage was his. Flores, now exhibiting signs of nervousness such as shaking hands and choppy speech, replied that the bags were his but that he did not know what was in them because they had been packed by someone else. Upon receiving this response, Whitmore informed Flores that he had reason to believe that the luggage contained narcotics. Whitmore also told Flores that unless Flores gave his permission Whitmore would have to seek a warrant in federal court before opening the luggage. Flores replied that Whitmore should "check out" the luggage because that was his job. Agent Whitmore asked Flores and Vasquez whether they would mind stepping inside, and the two suspects and the three agents returned to the terminal building. Flores and Vasquez were again advised by Agent Whitmore that he had no authority to open the bags unless they consented and that without their consent he would have to seek a search warrant in court. Flores again told Whitmore to open the bags, while Vasquez continued to indicate that the bags were not hers. When the bags were opened the agents found several packages of heroin. Flores and Vasquez were arrested, given the appropriate warnings, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and driven to the DEA office at Kennedy Airport for processing.

The uncontradicted testimony of the agents and the skycap was to the effect that the agents were not in uniform, that all questioning was carried on in a conversational tone of voice, that no weapons were displayed, and that neither Vasquez nor Flores was touched by any of the agents prior to the formal arrests.

## II. *The Stop*

During the current term this Court has heard a number of appeals challenging the admissibility of evidence seized by DEA agents who have stopped suspected narcotics couriers arriving at La Guardia and obtained their consent to conduct a search.[4] The legal standards against which we must assess these stops are therefore familiar, as is the scenario which typically leads up to these encounters.

As the Supreme Court has recently reaffirmed, the essential purpose of the Fourth Amendment is to impose a standard of reasonableness on government officials in order to safeguard the privacy and security of individuals against arbitrary invasion. *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). Therefore, the *Prouse* Court explained,

> the permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually · requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test.

*Id.* (footnotes omitted). When a seizure entails "the kind of intrusion involved in an arrest," the reasonableness standard of the Fourth Amendment generally requires that the officers act on no less than probable cause. *Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d

---

4. *See, e. g., United States v. Vasquez-Santiago, supra,* 602 F.2d 1069; *United States v. Price, supra,* 599 F.2d 494; *United States v. Rico,* 594 F.2d 320 (2d Cir. 1979) (search of both luggage and suspects). *See also* cases heard in earlier terms, *United States v. Riquelmy,* 572 F.2d 947 (2d Cir. 1978); *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977). In each of these cases, except the last one cited, Agent Whitmore partici-

pated in the stop. Oates apparently arrived at La Guardia on Whitmore's day off.

The Sixth Circuit has also decided a number of airport stop cases over the past few terms. *See, e. g., United States v. Mendenhall,* 596 F.2d 706 (6th Cir. 1979) (en banc), *cert. granted,* —— U.S. ——, 100 S.Ct. 113, 62 L.Ed.2d 73 (1979); *United States v. McCaleb,* 552 F.2d 717 (6th Cir. 1977).

824 (1979).[5] However, it has long been the law that a less intrusive stop may be reasonable under the Fourth Amendment if the facts upon which the intrusion is based meet the "less stringent" although still "objective" standard of "reasonable suspicion." *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). It is clear that the investigative stop at issue in this case does not "fit comfortably within the traditional concept of an 'arrest'" because the intrusion involved is "so much less severe." *Dunaway v. New York, supra,* 442 U.S. at 209, 99 S.Ct. at 2254; *United States v. Vasquez-Santiago,* 602 F.2d 1069, 1071 (2d Cir. 1979). Rather, the stop fits within the narrow and circumscribed category of minimally intrusive seizures first recognized in *Terry v. Ohio, supra,* and therefore may be deemed justified under the Fourth Amendment if it can be demonstrated, solely on the basis of specific and articulable facts and the rational inferences to be drawn therefrom, that the intrusion was based on reasonable suspicion. *United States v. Price,* 599 F.2d 494, 499 (2d Cir. 1979). *See also Brown v. Texas,* —— U.S. —— - ——, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

The constitutional standard of "reasonableness" takes into account both governmental and private interests. The public interest is measured by examining the need for the stop, and the individual's interest is calculated by assessing the gravity of the intrusion suffered. *United States v. Price, supra,* 599 F.2d at 499; *United States v. Magda,* 547 F.2d 756, 758 (2d Cir. 1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977), *citing Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. 1868. "The

need for a stop depends on factors such as the seriousness of the offense suspected, the consequences of delay on the part of the officers, and the likelihood of the detainee's involvement in the offense suspected." *United States v. Price, supra,* 599 F.2d at 500. That the offense suspected is heroin trafficking and that the departure of the suspect appears imminent are both factors increasing the need for a stop. *Id.; United States v. Oates,* 560 F.2d 45, 59 (2d Cir. 1977); *United States v. Magda, supra,* 547 F.2d at 759; *United States v. Santana,* 485 F.2d 365, 368 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974).

■ As to the likelihood of the appellant's involvement in the suspected crime, according to testimony credited by Judge Platt, the agents' stop of Vasquez and Flores was based on the following observations:

1. Vasquez and Flores arrived on a flight from Chicago, a known "source" city. *See United States v. Vasquez-Santiago, supra,* 602 F.2d. at 1072; *United States v. Price, supra,* 599 F.2d at 500.

2. Vasquez and Flores were the last passengers to disembark.

3. Although Vasquez and Flores were engaged in conversation as they disembarked, when they reached the corridor they stopped and separated. *Cf. United States v. Vasquez-Santiago, supra,* 602 F.2d. at 1072.

4. Vasquez followed Flores at a distance of about 10 yards, keeping Flores in view and frequently glancing behind her ("to see if she was being followed" in Judge Platt's assessment). On two occasions she stopped and made a full turn in order to survey

5. In *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979), the Court held unconstitutional Dunaway's detention by the police, in the absence of probable cause, explaining that the detention was "in important respects indistinguishable from a traditional arrest." The Court specifically noted, *inter alia,* that Dunaway "was not questioned briefly where he was found" but

was instead "transported to a police station, and placed in an interrogation room." *Compare Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), in which the Court overturned a conviction based on evidence obtained when, in the absence of probable cause, the appellant was taken to a police station and detained for fingerprinting and questioning.

the area. *Cf. United States v. Vasquez-Santiago, supra,* 602 F.2d. at 1071; *United States v. Price, supra,* 599 F.2d at 496.

5. In the baggage claim area, Vasquez remained about ten yards away from Flores. Although the two made frequent eye contact, according to the agents' testimony no signs of recognition were exchanged.

6. Although she waited for the baggage to arrive, Vasquez claimed nothing.

7. When Flores gave his destination to the skycap, Vasquez corrected him, again moved away from Flores, and then proceeded to follow Flores and the skycap at a distance of ten to fifteen feet.

8. The two bags claimed by Flores bore no identification. *See United States v. Price, supra,* 599 F.2d at 496; *United States v. Rico,* 594 F.2d 320, 322 (2d Cir. 1979). One of them was secured with a small padlock identical to those the agents had observed, on two occasions during the preceding year, attached to luggage which had arrived from Chicago and which was found to contain heroin.

We agree with Judge Platt's conclusion that these observations and the rational inferences to be drawn therefrom rendered reasonable the minimally intrusive stop under consideration.

In reaching this determination we keep in mind two principles:

The circumstances surrounding a stop "are not to be dissected and viewed singly; rather they must be considered as a whole." . . . In addition, these circumstances "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."

*United States v. Price, supra,* 599 F.2d at 501, *quoting, inter alia, United States v. Oates, supra,* 560 F.2d at 61; *United States v. Magda, supra,* 547 F.2d at 758. Thus while any one of the specific factors noted by the DEA agents might appear unexceptional if viewed in isolation, in our view the composite picture would appear sufficiently suspicious, at least to the trained eye,[6] to warrant a minimally intrusive stop for purposes of further investigation. "[S]ome patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before." *United States v. Oates, supra,* 560 F.2d at 61. Even the fact that the conduct of Vasquez and Flores might possibly have been consistent with innocence does not invalidate the stop. As we have noted before, "reasonable" cause for suspicion of narcotics trafficking may suffice to justify a minimally intrusive stop. "Certainty is not a constitutional prerequisite . . . ." *United States v. Price, supra,* 599 F.2d at 502.

Thus the initiation of the stop was not unreasonable in this case. Nor did the scope of the intrusion exceed what was warranted under the circumstances. There was no evidence of harassment, intimidation, physical restraint, humiliation or prolonged questioning. *See United States v. Price, supra,* 599 F.2d at 500; *United States v. Magda, supra,* 547 F.2d at 759. After Agent Whitmore identified himself and determined that Flores spoke English, the agent's first request was to see some identification as well as Flores' airplane ticket. In view of the conduct observed by Agent Whitmore, this initial stop for the purpose

**6.** That Whitmore's extensive training and experience, detailed in *United States v. Price, supra,* 599 F.2d at 501 n.8, enabled him to draw reasonable inferences from facts that might strike a less seasoned observer as unimportant was demonstrated a number of times during the suppression hearing. For example, the fact that the luggage was not tagged gains significance from Whitmore's estimate that over 90 percent of the luggage he observes carries the identification required by the airlines. Similarly, the padlock on one of Flores' bags gained significance from the fact that the agents had observed the same style of lock on two recently intercepted heroin shipments from Chicago. "As long as the elements of the pattern are specific and articulable, the powers of observation of an officer with superior training and experience should not be disregarded." *United States v. Price, supra,* 599 F.2d at 501.

of limited questioning falls within the *"sui generis"* category of "narrowly defined less intrusive seizure[s]" that satisfy the Fourth Amendment "on grounds less rigorous than probable cause." *Dunaway v. New York, supra,* 442 U.S. at 210, 99 S.Ct. at 2255; see *United States v. Brignoni-Ponce, supra,* 422 U.S. at 880, 95 S.Ct. 2574.

Flores' assertion that he had no ticket could serve only to heighten the suspicion of a reasonable observer who, like Whitmore, had just seen Flores put his ticket in his pocket. *Cf. United States v. Rico, supra,* 594 F.2d at 323. Since Vasquez had simultaneously told the agents that Flores was holding her ticket, Whitmore also cannot be said to have acted unreasonably in repeating his request for the tickets. When, in response, Flores produced tickets bearing a name matching neither the name given by Flores nor that given by Vasquez, yet another objectively suspicious factor was added to the earlier observations of the agents. When, after one more question from Agent Whitmore, Flores volunteered that although the bags were his he did not know what was in them, the compelling need for further questioning of both suspects was manifest. Since Vasquez and Flores were apparently acting in concert while trying to appear not to be doing so, it was not unreasonable in this case for the agents to consider the answers and responses of both in determining the propriety of continuing the questioning of each.

Although we share Judge Oakes' view that the courts should not countenance the chipping away, by over-zealous law enforcement officers, of the protections of the Fourth Amendment, we do not share his belief that today's decision and the precedents on which it is grounded have, in effect, carved out a new exception to the law governing searches and seizures, narrowed the scope of the Fourth Amendment, or broadened the scope of *Terry v. Ohio, supra.*

Like Judge Oakes we reject any suggestion that, in the absence of border search or special safety justifications, a stop made at an airport may be judged by criteria different from those governing stops made anywhere else in this country. There is no separate body of Fourth Amendment law applicable to domestic airport stops by the DEA. Where Vasquez was stopped is a factor to be considered in determining whether the stop was reasonable, but it is not a factor to be considered in determining the standard against which the stop must be judged. That standard is, of course, dictated by the Fourth Amendment.

Clearly then, we must reject the suggestion in the dissent that our Court has narrowed the scope of Fourth Amendment protection in the recent series of "DEA-airport" stop cases. The precise purpose of both the suppression hearing below and of our review has been to subject the actions of Agent Whitmore, the law enforcement officer in the field, to examination by neutral and detached judicial officers whose duty is to determine the constitutionality of his conduct by the application of objective standards which give weight only to specific and articulable factors justifying that conduct.

We cannot agree with the characterization of this case and its predecessors as "expansions" of *Terry v. Ohio, supra.* The facts of *Terry* are uncomplicated and worth recalling. One afternoon, while patrolling the downtown area of Cleveland, Ohio, one Officer McFadden observed that two men whom he had never seen before were standing on a corner. Officer McFadden was "unable to say precisely what first drew his eye to them" except for the feeling that they "didn't look right," 392 U.S. at 5, 88 S.Ct. at 1871. Officer McFadden continued to watch the two men as they walked repeatedly past a particular store window, one at a time, paused to look inside, and returned to the corner to confer. After many repetitions, the two men walked off, following the path taken by a third man who had spoken with them briefly a few minutes earlier.

Believing on the basis of these observations that the men were "casing a job," *id.* at 6, 88 S.Ct. 1868, Officer McFadden approached the three men, identified himself as a police officer and asked for their

names.[7] "When the men 'mumbled something' in response to his inquiries, Officer McFadden grabbed petitioner Terry, spun him around . . . and patted down the outside of his clothing." *Id.* at 7, 88 S.Ct. at 1872. Feeling a pistol in Terry's pocket, McFadden seized it. Terry was subsequently convicted of carrying a concealed weapon, and the Supreme Court, for the first time, passed upon the constitutionality of the "stop and frisk."

Understandably the Court focused primarily on the "frisk" aspect of this interaction, for it was the frisk that had yielded the pistol that Terry sought to have suppressed. The Court emphasized that the crux of the case was "not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation." *Id.* at 23, 88 S.Ct. at 1881. In fact, the Court "assume[d]" that up to the initiation of physical contact "no intrusion upon constitutionally protected rights had occurred," and declined to decide anything concerning the "constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation." *Id.* at 19 n.16, 88 S.Ct. at 1879.

We can find nothing in *Terry* or its progeny to support the view, implicit in Judge Oakes' dissent today, that the right of a police officer to stop a person reasonably suspected of engaging in criminal activity, for the purpose of asking a few questions, hinges on the reasonable suspicion that the suspect is armed and dangerous. The cases suggest otherwise. Chief Justice Warren, speaking for the Court in *Terry*, recognized "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating *possibly criminal behavior* even though there is no probable cause to make an arrest," and noted that "[i]t was this

legitimate investigative function Officer McFadden was discharging when he decided to approach [the suspects]." *Id.* at 22, 88 S.Ct. at 1880 (emphasis added). Justice Harlan, in concurrence, grappled more directly with the pre-frisk aspect of the stop. "[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop." *Id.* at 32, 88 S.Ct. at 1885 (emphasis in original).

The facts of this case are illustrative of a proper stop and an incident frisk. Officer McFadden . . . had observed circumstances that would reasonably lead an experienced, prudent policeman to suspect that *Terry was about to engage in burglary or robbery.* His justifiable suspicion afforded a proper constitutional basis for accosting Terry, restraining his liberty of movement briefly, and addressing questions to him . . . . .

*Id.* at 33, 88 S.Ct. at 1886 (emphasis added).

Four years later, in *Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. at 1923, the Court wrote: "So long as the officer is entitled to make a forcible stop, *and* has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to [a] protective purpose." (emphasis added, footnote omitted). Again, the implication is strong that entitlement to make the *stop* depends on a reasonable belief that the suspect is engaging in criminal activity, regardless of whether he is also armed and dangerous. *See also United States v. Nieves,* 609 F.2d 642 (2d Cir. 1979), and cases cited therein.

Nor, in our view, does *Dunaway v. New York, supra,* stand for the proposition that an officer may stop a suspect only in circumstances that would justify a frisk. *Dunaway* simply reaffirms the important principle that a maximal intrusion, even if technically short of arrest, must be based upon probable cause.

---

7. As is usually the case, the observations giving rise to the officer's suspicion were capable of innocent explanation. Terry and his companions could have been indecisive window shoppers, security guards observing a suspicious customer, window dressers intent on stealing ideas from the competition, or managers checking up on their sales people.

Judge Oakes would delay judicial approval of what he terms a new system of law enforcement until it can be demonstrated that the official conduct under challenge is the product of rulemaking and is not carried out in a discriminatory manner. As to the first suggestion, we note that it was the very different question of *random* stops, which are concededly based on *neither* the objective standard of probable cause *nor* the objective standard of reasonable suspicion, that concerned the Court in *Delaware v. Prouse, supra,* and prompted the observation that *some* objective standard or rule must guide the exercise of official discretion. Regarding Judge Oakes' suggestion that Vasquez's possibly Hispanic appearance played an impermissible role in the decision to stop her, we note that the evidence that would support such a claim is ambiguous at best. When improper police conduct is identified, it must and will be condemned by this Court. However, as the Supreme Court has recognized, evidence properly obtained in one case should not be excluded as a protest against the ever present possibility of abuse of evidence gathering techniques in another, hypothetical, case. *Terry v. Ohio, supra,* 392 U.S. at 14–15, 88 S.Ct. 1868.

Having determined that the stop of Vasquez did not violate her Fourth Amendment right to be free of unreasonable seizures, we need not consider whether the search of the luggage can logically be viewed as the "fruit" of that stop.

### III. *The Search*

 As noted above, Vasquez challenges not only the stop but the search that followed.[8] However, we see no reason to

---

8. Although for the reason stated below we reach and decide the question of the validity of the challenged "consent search," it should be noted that the record fails to demonstrate that Vasquez has standing to raise this argument on appeal. "[T]o establish standing to move to suppress evidence on Fourth Amendment grounds, the movant must ordinarily demonstrate that the evidence was seized as a result of an invasion of his own legitimate expectation of privacy . . . ." *United States v. Oates, supra,* 560 F.2d at 52. In challenging the agents' actions in stopping her at the airport, Vasquez relied on her personal right to be free from unreasonable seizures of her person. Thus, her standing to test the stop, in the district court and on appeal, is apparent on the face of that claim. However, Vasquez's standing to challenge the *search* that followed presents a more complicated question.

After their arrests, Flores and Vasquez were each indicted on one count of conspiracy to distribute heroin, 21 U.S.C. § 846, and on one count of possession of heroin with intent to distribute, 21 U.S.C. § 841(a)(1). Since she was charged with a possessory offense, under *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), Vasquez had automatic standing to challenge the search by moving to suppress the evidence obtained although she has never claimed a possessory interest in the luggage searched. *See also Rakas v. Illinois,* 439 U.S. 128, 135 n.4, 99 S.Ct. 421, 426, 58 L.Ed.2d 387 (1978) ("We have not yet had occasion to decide whether the automatic standing rule of *Jones* survives our decision in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)."); *United States v. Riquelmy,* 572 F.2d 947, 950 (2d Cir. 1978) ("we have declined the invitation to rule out automatic standing . . . until the Supreme Court rules on that issue . . ."); *United States v. Galante,* 547 F.2d 733, 737 (2d Cir. 1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977). A defendant successfully invoking automatic standing need not, in addition, meet the usual requirement of demonstrating the invasion of a personal Fourth Amendment right. *United States v. Oates, supra.*

However, standing to appeal is not necessarily coextensive with standing to raise an issue in the trial court. After Judge Platt denied the defendants' suppression motions, Vasquez pleaded guilty *only* to the communications facility charge, which did not appear in the indictment but was contained in a one-count superseding information filed upon her waiver of indictment. Because Vasquez stands convicted of only a non-possessory offense she cannot now rely on the doctrine of automatic standing in challenging that conviction. Nor can the government or the district court confer standing to appeal, as part of a plea bargain, where it does not otherwise exist.

In the record of the proceedings below, there is no mention of the issue of standing to appeal. Therefore, it is possible that Vasquez's guilty plea was induced, at least in part, by the belief that she would be permitted to appeal both issues that were decided by the denial of her motion to suppress.

Because Vasquez may have neglected to claim a possessory interest in the luggage only because of the assumption, apparently shared by the parties and the court below, that it was unnecessary for her to do so, and because the

overturn the district court's finding that Flores voluntarily consented to the search of the luggage.

■ First, the district court properly noted that when the government relies on consent in lieu of a warrant it bears the burden of proving that any purported consent was in fact voluntary rather than "the product of duress or coercion, express or implied," *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Second, the district judge carefully considered the totality of all the circumstances in making his determination. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. 2041. The court found no overbearing conduct or threats of any kind on the part of the agents and credited the uncontradicted testimony that Flores had twice been advised of his right to refuse to consent—a factor weighing heavily in the determination of voluntariness. *Id.* Because it cannot be characterized as clearly erroneous, the district court's finding of voluntariness must stand. *United States v. Vasquez-Santiago, supra,* 602 F.2d at 1073; *United States v. Price, supra,* 599 F.2d at 504.

As neither the stop nor the search violated appellant's Fourth Amendment rights, the judgment of conviction is affirmed.

IRVING R. KAUFMAN, Chief Judge (concurring):

I concur in Judge Meskill's thorough opinion. In light of my brother Oakes's dissent, however, I add a few words to clarify my views in this difficult area. Our disagreement lies not in our mutual concern for fundamental rights of privacy, but rather in the extent to which our prior cases preclude, at least temporarily, reconsideration of the principles that undergird them.

The Fourth Amendment, on its face, prohibits only those searches and seizures that are "unreasonable." Courts, therefore, must undertake the "difficult task" of translating this "abstract prohibition . . . into workable guidelines for the decision of particular cases." *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Thankfully, our struggle to divine the limits of reason in concrete cases is rendered less onerous by the basic precept that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

Nevertheless, in *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), Chief Justice Warren wrote for the Court that in "appropriate circumstances and in an appropriate manner," a law enforcement official may "approach a person for purposes of investigating possible criminal behavior," armed with neither warrant nor probable cause to arrest. Despite the obvious utility of these so-called *Terry* stops to effective law enforcement, the Chief Justice emphasized that in adjudicating their propriety, courts must "make the scope of the particular intrusion . . . a central element in the analysis of reasonableness." *Id.* at 18 n.15, 88 S.Ct. at 1878. Based on *Terry,* therefore, the Supreme Court has consistently reiterated that a "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information," *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), satisfies the Fourth Amendment if "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry, supra,* 392 U.S. at 21–22, 88 S.Ct. at 1880. *Accord, United States v. Brignoni Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Terry* and its progeny, as Judge Oakes cogently argues, threatened to unlock a Pandora's Box by permitting police officers

record indicates that such a claim might possibly have been sustained, we reach the merits of her argument in order to ensure that she receives the full benefit of her plea bargain. *But cf. Rakas v. Illinois, supra,* 439 U.S. at 130 n. 1, 99 S.Ct. 421.

to "seize" citizens without the dual safeguards of a warrant and probable cause. But *Terry* itself limited the potential abuse inherent in a grant of broad discretion to law enforcement officials by requiring that a police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion at issue. *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1880. In this manner, the Supreme Court apparently believed, judges could discern impermissible actions not based on "reasonable" suspicion.

The plethora of airport-search cases decided by this court have relied on these teachings of *Terry. See, e.g., United States v. Vasquez-Santiago,* 602 F.2d 1069 (2d Cir. 1979); *United States v. Price,* 599 F.2d 494 (2d Cir. 1979); *United States v. Rico,* 594 F.2d 320 (2d Cir. 1979); *United States v. Riquelmy,* 572 F.2d 947 (2d Cir. 1978); *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977); *United States v. Magda,* 547 F.2d 756 (2d Cir. 1976). The *modus operandi* in these cases is that agents of the Drug Enforcement Administration (DEA) stop individuals disembarking from incoming domestic flights and ask them for identification and a few questions concerning their presence in the airport. To justify even these limited intrusions, we have required DEA agents to state the "specific and articulable" facts mandated by *Terry.* To be sure, the agents' recitations have taken on a familiar ring—"source" cities, darting eyes, twisting heads and bodies, nervous demeanor, etc. But although it has not gone without notice that the vast majority of these "suspects" have been of Hispanic ancestry, our prior cases, grounded firmly in *Terry,* have held that this disturbing factor is effectively counterbalanced by the ability of DEA agents to articulate specific facts that render their suspicions reasonable.

Thus, I do not suppose that any of us would have been troubled by this case were it not for *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In *Dunaway,* the Court intimated that *Ter-*ry has been interpreted too generously. Mr. Justice Brennan suggested, though by no means expressly, that *Terry* may be limited to its specific facts and thus confined to a protective search for weapons. *See id.* at 210, 99 S.Ct. 2255. Nevertheless, the opinion also contains passages indicating the continued validity of minimally intrusive stops in a variety of settings. *Id.* Thus, although I sympathize with Judge Oakes's view that *Dunaway* invites reconsideration of our airport-search cases, I am constrained to abide by established precedent and leave that leap to a higher court. Indeed, this issue, may soon be resolved in *United States v. Mendenhall,* 596 F.2d 706 (6th Cir. 1979) (en banc), *cert. granted,* —— U.S. ——, 100 S.Ct. 113, 62 L.Ed.2d 73 (1979), the first airport-search case to reach the high court. I am hopeful that the justices will illuminate the contrary dicta of *Dunaway,* and thus signal the proper resolution of future cases. For the moment, I am satisfied that *Terry* retains sufficient force to warrant its application in the instant case. I therefore join in my brother Meskill's opinion.

OAKES, Circuit Judge (dissenting):

In the traditional, what Anthony Amsterdam has called the "atomistic,"[1] approach to the Fourth Amendment, there were two questions: first, was the practice a "search" or "seizure" and, second, did it invade the constitutionally protected area of a person, his house, papers, or effects? *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in strengthening the "atomistic" focus, reframed the questions into one inquiry, whether there was an invasion of "what [a person] seeks to preserve as private, even in an area accessible to the public." *Id.* at 351, 88 S.Ct. at 511. If so, the "Government's activities [which] . . violated the privacy upon which [the person] . . . justifiably relied . . . thus constituted a 'search and seizure' within the meaning of the Fourth Amendment," *id.* at 353, 88 S.Ct. at 512, "[f]or the Fourth Amendment protects people, not places."

---

1. Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 367 (1974).

*Id.* at 351, 88 S.Ct. at 511. It followed from this that "the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure," *id.*, or I would add upon the presence or absence of any physical intrusion whatsoever.

Almost immediately, however, in *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),[2] the Court redivided Fourth Amendment analysis into two parts to ask not only whether the individual harbored a reasonable "expectation of privacy," *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring),[3] but also whether there had been an "unreasonable governmental intrusion." *Terry v. Ohio,* 392 U.S. at 9, 88 S.Ct. 1868. The *Terry* approach tended "to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness." *Id.* at 18 n.15, 88 S.Ct. at 1878.

*Terry* held that a "search and seizure" had occurred when the officer stopped the petitioner and frisked him, but further inquired as to "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879. In so doing, the Court considered the "general interest" of the Government in "effective crime prevention and detection," permitting an officer "in appropriate circumstances and in an appropriate manner" to approach a person to investigate "possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880. And the intrusion

must be based on nothing less than "specific and articulable facts." *Id.* at 21, 88 S.Ct. 1868. The Court concluded that a stop is justified when the observed conduct is sufficiently suspicious to suggest a crime is in the making and that a frisk or pat-down is not an unreasonable intrusion when the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous . . . ." *Id.* at 24, 88 S.Ct. at 1881. It examined in depth the manner and conduct of the pat-down, *id.* at 27–30, 88 S.Ct. 1868, eventually finding it not unreasonable. *Terry* presents, then, a kind of sliding-scale approach to the Fourth Amendment, carving out from the full protective impact of the Amendment police conduct exercised without probable cause, as long as it is based on "specific and articulable facts" and is not unreasonably "intrusive."

*Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), extended the *Terry* exception to include investigation of "possessory offenses," in that case possession of a gun, and permitted the police officer to act on only an informer's tip, without direct observation or authentication, but with "indicia of reliability" short of probable cause. *Id.* at 147, 92 S.Ct. 1921. The Court went on to hold that when the officer found a gun on the person searched, the probable cause requirement for arrest had been met.

The question in today's case is whether we will now expand the *Terry-Adams* exception to a *course of organized police conduct* practiced by the Drug Enforcement Administration at airports across the country, not simply an individual police officer perceiving that a crime is about to be or has been committed. This case is just one of

---

2. See also its companion cases, *Sibron v. New York* and *Peters v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

3. Justice Harlan's phrase speaks to subjective expectations, a position which has logical problems (for one's subjective expectations can always be diminished by mere governmental warning) and which he himself came to disregard, in *United States v. White,* 401 U.S. 745,

786, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting) ("The analysis must, in my view, transcend the search for subjective expectations or legal attribution of assumptions of risk. Our expectations, and the risks we assume, are in large part reflections of laws that translate into rules the customs and values of the past and present.").

many, we are informed by the Government's successful petition for certiorari in *United States v. Mendenhall*, 596 F.2d 706 (6th Cir. 1979) (en banc), *cert. granted,* —— U.S. ——, 100 S.Ct. 113, 62 L.Ed.2d 73 (1979) (where the court of appeals held "that the so-called drug courier profile does not, in itself, represent a legal standard of probable cause in this Circuit," *id.* at 707), arising out of a DEA program in operation at more than twenty United States airports. *See* Petition for Certiorari at 2–3 & n.1 (citing cases). As the petition informs us:

> Under the program, trained and experienced agents observe arriving and departing passengers on certain flights for characteristics and behavioral traits which, on the basis of their collective experience, have tended to distinguish drug couriers from other passengers. The DEA and its agents in the field have also developed relatively standard procedures for approaching and questioning individuals suspected of being drug couriers.

*Id.* at 3 (footnote omitted).

> These traits and characteristics, sometimes referred to as a "drug courier profile," include such elements as round trips of short duration between major drug centers, purchasing tickets with cash (and particularly small bills), no baggage except carry-on-items, deplaning last, and, in general, nervous or unusual behavior. See *United States v. Van Lewis, supra,* 409 F.Supp. 535 at 538.

*Id.* at 3 n.2. The Government Petition also says:

> As a factual matter, there is no national profile; each airport unit has developed its own set of drug courier characteristics on the basis of that unit's experience. While many of the salient characteristics are common to the guidelines of most, if not all units, there are some differences based on the particular experiences of different units and the peculiar characteristics of each airport. Furthermore, the profile is not rigid, but is constantly modified in light of experience.

> The basic purpose of the profile is to inform, but not to serve as a substitute for, the agents' judgment in particular circumstances.

*Id.* at 17 n.17.

What has happened, I fear, is that this court, in a series of cases[4] which have usually involved one very active DEA agent, has put its stamp of approval on a *system* of law enforcement, without full appreciation of its overall impact and implications. Each case individually may have seemed but a little step beyond *Terry,* but in so moving we have in effect given birth to a new DEA-airport exception that falls outside the protections of the Fourth Amendment. A facial reading of the eight "specific and articulable facts" in the instant case reveals the shallowness of the "reasonable suspicion" here. At least in *Terry,* the two men walked alternately past the store and back, peering in its window no fewer than twenty-four times, not exactly Vasquez's two or three glances back. While the Supreme Court in *Mendenhall* will, of course, tell us whether it will put its stamp of approval on this new exception, I do note that *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the companion case to *Terry,* pointedly limited at least the *Terry* search to a factual setting involving "the protection of the officer by disarming a potentially dangerous man." 392 U.S. at 65, 88 S.Ct. at 1904; *see also id.* at 61 n.20, 88 S.Ct. 1889.

More recently, the Court has again reminded us of the narrowness of the *Terry* exception. While *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), involved a custodial detention and hence is different from our case, the Court did say:

> *Terry* departed from traditional Fourth Amendment analysis in two respects. First, it defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures"

---

4. *See* majority opinion n.4.

reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons.

Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope. *Terry* itself involved a limited, on-the-street frisk for weapons.

*Id.* at 209–210, 99 S.Ct. at 2255 (footnote omitted).[5]

Respondent State now urges the Court to apply a balancing test, rather than the general rule, to custodial interrogations, and to hold that "seizures" such as that in this case may be justified by mere "reasonable suspicion." *Terry* and its progeny clearly do not support such a result.

*Id.* at 211–212, 99 S.Ct. at 2256 (footnote omitted).

[P]etitioner's seizure [is not] even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are

"reasonable" only if based on probable cause.

*Id.* at 212–213, 99 S.Ct. at 2256.

I note also that in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court was careful to say:

The Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief. *United States v. Martinez-Fuerte,* 428 U.S. 543, 556–58 [96 S.Ct. 3074, 3082–3083, 49 L.Ed.2d 1116] (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 [95 S.Ct. 2574, 2578, 45 L.Ed.2d 607] (1975); *cf. Terry v. Ohio,* 392 U.S. 1, 16 [88 S.Ct. 1868, 1877, 20 L.Ed.2d 889] (1968).

*Id.* at 653, 99 S.Ct. at 1396.

So, too, in *Brown v. Texas,* —— U.S. ——, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Chief Justice for a unanimous Court said: "When the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment." *Id.* at ——, 99 S.Ct. at 2640.[6]

---

**5.** The Court characterizes *Terry* as allowing the less intrusive seizure, *i.e.,* stop, "only for the purpose of a pat-down for weapons." *Dunaway v. New York,* 442 U.S. 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979). One wonders whether the Court is really talking about a "search" rather than a "seizure," or at least a combination of the two, for, as *Terry* defines, "it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a *'search.'"* *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) (emphasis added). But if the Court's reading in *Dunaway* is correct, then stops not related to weapons searches or safeguarding the public's or police officers' safety may fall outside the *Terry* exception.

**6.** *Brown* appears, then, to have at least partially answered the question left open in *Terry* pertaining to what constitutes a "seizure." *Terry* noted the following:

We thus decide nothing today concerning the constitutional propriety of an investiga-

tive "seizure" upon less than probable cause for purposes of "detention" and/or interrogation. Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred. We cannot tell with any certainty upon this record whether any such "seizure" took place here prior to Officer McFadden's initiation of physical contact for purposes of searching Terry for weapons, and we thus may assume that up to that point no intrusion upon constitutionally protected rights had occurred.

*Terry v. Ohio,* 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Prior to the pat-down in *Terry,* Officer McFadden had "approached the three men, identified himself as a police officer and asked for their names." *Id.* at 6–7, 88 S.Ct. at 1872. So, too, in *Brown,* —— U.S. ——, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979): "The car entered the alley, and officer Venegas got out and asked appellant to identify himself

The Court's language, then, in *Sibron, Dunaway, Delaware,* and *Brown* directs us to the overall implications of a widened *Terry* exception. If airports can support special police conduct, why not other public places—bus terminals, railroad stations, subway stops, restaurants, bars? If Agent Gerard Whitmore and DEA agents in general, why not any other officer "trained" to observe "suspicious conduct"? Once the dam is broken, a flood is likely to occur. Anthony Amsterdam has perceptively warned against the "perversion" of stop-and-frisk or similar limited-purpose police actions into general search warrants, putting, in James Otis's words, "the liberty of every man in the hands of every petty officer." [7]

The Government will, of course, claim that this is a valid limited-purpose stop, although it strikes me as more for purposes of general investigation. In any event, before I would open up this door—even for such a good law-enforcement reason as stopping drug traffic between "source cities"—I would want to be sure of two things. The first is that this whole area be made the subject of rulemaking. This is, I believe, suggested by language in *Delaware v. Prouse, supra,* although the concept was also advanced in our *United States v. Barbera,* 514 F.2d 294, 302–04 (2d Cir. 1975). *Delaware* reads as follows:

> To insist upon neither an appropriate factual basis for suspicion directed at a particular automobile nor *upon some other substantial and objective standard or rule*

to govern the exercise of discretion "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ." *Terry v. Ohio, supra,* 392 U.S. at 22, 88 S.Ct. [1868] at 1880.

440 U.S. at 661, 99 S.Ct. at 1400 (emphasis added).

I would require some *substantial* and *objective* standard or rule to govern the exercise of discretion rather than depend simply upon the keen eye of Agent Whitmore [8] or any other agent. Thus, in *Barbera,* a "border search" case, we suggested the possibility of "legislation or departmental . . . rules and regulations subject to judicial review for reasonableness." 514 F.2d at 302. Rulemaking could easily be done here by the Department of Justice or the DEA, and the benefits to be gained by citizens, the agency, and the courts would be substantial.[9] The courts would then be relieved of their current unenviable task of asking themselves whether Maria Vasquez made one glance behind too many. Such factual line-drawing may be better made, at least as an initial matter, within a set of codified agency rules.

The second thing I would need assurances of is that the rules were framed and enforced so as not to discriminate against any particular group on account of race, ethnic background, or the like. One has the uncomfortable impression here that, but for the Hispanic appearance of Flores and Vas-

and explain what he was doing there." Unless the interposition of a car makes a sufficient factual distinction, and it is hard to imagine why it would, the situations are virtually identical.

7. Amsterdam, *supra* note 1, at 438.

8. After all, although we know some of his successes, we do not know his failures. This is why many of these cases smack of wisdom born of the event—after all, she did have heroin.

9. *Barbera,* drawing from Professor Amsterdam's article, Amsterdam, *supra* note 1, sets them out as follows:

Rulemaking, which could so readily be done here . . . would (1) enhance the quality of [DEA] decisions (a) by focusing attention on the fact that *policy* is being made, (b) by putting the authority in responsible and capable hands, and (c) by promoting efficiency; (2) would tend to insure fair and equal treatment of citizens (a) by reducing the influence of bias, (b) by providing uniform standards, and (c) by guiding police behavior; (3) would increase the visibility of the decisions; and (4) offers the best hope for consistent obedience to and enforcement of the constitutional norms that guarantee the citizen's liberty.

514 F.2d at 303 (footnotes omitted).

quez, they might not have been stopped.[10] If that appearance were an overriding factor, *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (roving border patrol stops of cars based on appearance of Mexican ancestry held invalid), would come into play. Any set of rules or regulations should embody, I think, protections of this nature. As the Court said in *Brown v. Texas*:

> [T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

—— U.S. at ——, 99 S.Ct. at 2640.

Accordingly, because neither of these conditions has been met, and because the incident in the instant case is not an isolated event, but rather part of a major law enforcement practice, a distinction the implications of which had previously escaped me, I respectfully dissent.

---

**10.** Agent Whitmore's testimony on cross-examination at the trial indicates that the Hispanic appearance played at least some part in the formulation of suspicion:

> Q. [T]he fact that a person is of Spanish descent would leave you some suspicion per se is that correct?
>
> A. It would make them, make us more aware of them.
>
> Q. So, if somebody from Irish or Italian background had gotten off the plane and looked around and glanced back perhaps looking for someone you wouldn't have been so suspicious of them, would you?
>
> A. It would depend upon their actions.
>
> Q. Well, in the exact same situation, if a man and a woman exhibited [*sic*] the airplane, the woman stopped and looked around

and she was Irish or American you wouldn't have been suspicious, that wouldn't have been enough just glancing around?

> A. If they had done it in the same manner that these people.
>
> Q. Would the glancing around be enough to arose [*sic*] your suspicion?
>
> A. Glancing around is not 'enough suspicion, no, sir.
>
> Q. So you are telling us now that the glancing around and the Spanish, Hispanic descent is what aroused your suspicion, is that correct?
>
> A. No, sir.
>
> Q. Well, the Spanish descent is part of your criteria, isn't it?
>
> A. It is something that we take cognizance of.