**UNITED STATES of America**
**v.**
**David MITCHELL, Defendant.**
**No. 72 CR 930.**

United States District Court,
E. D. New York.
Nov. 30, 1972.

---

Paul D. Lazarus, Asst. U. S. Atty., Brooklyn, N. Y., Robert A. Morse, U. S. Atty., of counsel), for the United States.

Marion Seltzer, Legal Aid Society, Brooklyn, N. Y., for defendant.

## MEMORANDUM and ORDER

DOOLING, District Judge.

Defendant on April 7, 1972, went to LaGuardia Airport to board the five-thirty Piedmont Airlines Flight 33 to Fayetteville, North Carolina. He was carrying the unused portion of a round-trip ticket from the South to New York and return; the ticket was in the name of G. Hewitt and not in defendant's name; defendant also had the Eastern Youth Card of Greg Hewitt and the Social Security card of Gregory Hewitt. When defendant went to the airlines ticket counter at Gate 31 he was erroneously classified as a selectee and his ticket was code marked accordingly. When the plane was ready for boarding, the flight announcement over the public address system incorporated a message

to the Marshals to attend at the gate, an Eastern Airlines gate, because the passengers for the flight included one or more selectees.

The door to the very small Marshals' office opens directly into the waiting area at Gate 31. Marshals John Whitty and John J. Walsh, who had been in their office, went from the Marshal's office toward the magnetometer which was at the opposite end of the waiting area from the door to the Marshals' office. Both Marshals testified, and it is found, that they observed the defendant going through the magnetometer frame, and then passing his carry-on bag through the magnetometer frame and looking at the screen on which the "reading" of the magnetometer shows in spots of illumination. Neither Marshal knew then or until later on that defendant was a selectee or the sole selectee on the flight.

Gate 31 was viewed in the presence of counsel for both sides, the defendant, his brother-in-law, and the Marshals. It is an oblong area, solid walled on its opposing, shorter sides, with its long exterior wall all glass above the lower few feet, the inner long-side, separating it from the wide corridor leading from the lobby, formed by a low masonry barrier, broken to form an entrance at which there is the usual small check-in and seat-assignment counter where flight coupons are picked up. At the extreme left end of the waiting area, as one enters it from the general corridor, there is, perpendicular to the general corridor, a passage way, separated from the waiting area by a low wall, which leads to the door giving entrance to the jetway. The only entrance from the waiting area to the passageway formed by the low wall at the end of the waiting area is through an opening at the end nearest the corridor from the lobby, and that opening is filled by the magnetometer frame. After going through the magnetometer frame passengers can turn either to the right and go along the passage to the jetway, or they can turn left and go out to the general corridor.

There is a direct conflict of testimony about the boarding of the plane and the incidents relating to it, but in general, it is necessary to accept the Marshals' version in its principal respects. The defendant's version appears to be quite at variance with the physical facts.

The Marshals say that when the defendant went through the magnetometer he activated it, indicating that he was carrying metal on his person or in his carry-on bag. As is apparently usual, he was asked to go through the magnetometer a second time, and he did so. Again he activated the magnetometer. Since the defendant was—seemingly—a selectee, Marshal Whitty, as spokesman for himself and Marshal Walsh, identified himself, told the defendant that he had activated the magnetometer and asked him whether he had identification with him. He immediately explained that he did, but that the G. Hewitt ticket he was carrying was not in his name, which, he said, was David Mitchell. He produced Mitchell identification and was, or had just been, holding the Hewitt ticket. (Later, after arrest he produced the Hewitt SSA and Youth cards.) Defendant was then patted down, and nothing that could have activated the magnetometer was found on his person. His carry-on bag was then felt and, on opening the bag, a clasp knife or jackknife was found which evidently could have activated the magnetometer. There was also in the bag a rather tightly wrapped bundle in an ordinary brownish kraft paper bag and below that a smaller foil-wrapped package. The Marshal lifted out the foil-wrapped package, opened it sufficiently to observe that it had a white powdery substance in it and asked the defendant what it was. The defendant said it was heroin. The Marshal then opened the brown paper bag and saw that it contained glassine envelopes like those usual in the drug trade. The defendant was immediately asked to go to the Marshal's office. There is no question whatever but that he was not free to go from the moment he said, "Heroin," on. In the

Marshal's office a field test was performed, the substance in both packages was indicated to be heroin, and defendant was formally placed under arrest for the possession of narcotics. He was not arrested for attempting to board an aircraft carrying a dangerous weapon about his person (49 U.S.C. § 1472(*l*)), and Marshal Whitty is clear that there was no intention of arresting the defendant for possessing the knife or for attempting to board an aircraft while carrying a knife.

The defendant's version is very different. He says that after the passengers went through the magnetometer frame instead of going to the right and through the passage leading to the jetway, they went left to the general corridor and along it to a staircase or escalator that led down to ground level, to board the plane there rather than through the jetway. He insists that the passengers, after they went through the magnetometer and turned left into the general corridor, went along to the staircase or escalator and were fed down the escalator or staircase under the guidance of a black airlines official in groups of two or three. He says that it was taking quite a while, so he went back into the boarding area (which would have required him again to pass through the magnetometer) and sat and waited; that then, when the line had dwindled substantially to nothing, he got up, went through the magnetometer again, and was passed by the airlines official down the staircase. He says the Marshal was at the foot of the staircase and that the Marshal asked him whether he had any metal on him, and he said that he did not. He says that then his bag was searched and the paper bag pulled out, and, asked what was in it, he said Deodorant and cologne. He says that the Marshal looked into it and saw the glassine bags and said, Come with me you're under arrest. He insists that he had no knife in his carry-on bag and that Marshal Walsh was not even present when this happened. He says that he was then taken to the Marshal's office and

Mr. Walsh was there. Then he said the heroin was field tested, and when the field test was evidently positive, he says that he was asked whether he knew what the substance in the brown bag was, and that, at first, he said that he did not, and, when asked again, after the field test, that he then said it looked like heroin.

The difficulty with accepting the defendant's version of the events is apparent. There is no likelihood that the Marshal or Marshals would have been at the foot of the staircase if the magnetometer was at the boarding gate many, many feet away, for the nearest staircase or escalator was a considerable distance, fifteen to thirty feet, away from the exit from Gate 31. There would be no practical way for the Marshal to know that a passenger had activated the magnetometer except by being at the magnetometer's side. Perhaps defendant's testimony is intended to suggest that the Marshal did not know of any activation of the magnetometer, but simply searched the defendant and his luggage gratuitously on the faith only of the fact that he seemed to be a selectee.

While the testimony of the Marshals is not perfect, theirs appears to be the substantially correct version; it immediately raises the question whether the search was a lawful one in the circumstances, *first,* that the defendant was not in fact a selectee, and *second,* in the light of the absence of any necessity to conduct any further search of the defendant and his hand luggage after unearthing the knife, apparently the only article that could have activated the magnetometer, and the discovery of which would sufficiently explain its activation.

An issue of consent is, of course, present.

Just before boarding was initiated and as part of the public-address system announcement of the boarding readiness of Flight 33 the Eastern Airlines announcer stated that the FAA Security program was in effect for the flight,

and that the passengers would have to go through a metal detection device; the passengers were asked to cooperate with the United States Marshals on duty. The familiar sign was posted on the heavy column in back and above the level of the ticket desk at the entry to Gate 31 and a smaller one was hung on one post of the magnetometer frame. The English text of the sign read:

IT IS A FEDERAL CRIME TO:
Carry Concealed Weapons
Aboard Aircraft
Interfere with Flight Crews

PASSENGERS and BAGGAGE
SUBJECT TO SEARCH UNDER:
Federal Laws
FAA Safety Regulations
Federal Aviation Administration
U. S. Department of Transportation

During the episode itself defendant was asked whether he objected to being patted down and whether he objected to having his carry-on bag searched. He did not object to either search. He was not told that if he did object, he would not be compelled to submit to search but would simply be turned back to the Eastern Air Lines representative, who would refuse to permit him to board the aircraft.

The magnetometer is never "turned off" between boardings. As the reported cases indicate, a great many persons activate the magnetometer who are not selectees and a great many of the latter are not interrogated or searched.

Neither the Government nor the defense has located any witness who can explain how the ticket desk came to classify David Mitchell erroneously as a selectee. The parties agree that the classification was wrong, and manifestly wrong, and that anyone familiar with the profile, as the Marshals were, could swiftly and unobtrusively determine that he was not a selectee.

The case is covered by the conclusion of the Court of Appeals in United States v. Bell, 2d Cir. 1972, 464 F.2d 667, except for the circumstance of the erroneous designation of Mitchell as a selectee. But, as the Court pointed out in Bell, United States v. Epperson, 4th Cir. 1972, 454 F.2d 769, sustained a search based upon magnetometer activation alone. The Court there used the analysis of Terry v. Ohio, 1968, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889, to support the use of the magnetometer as a search even though it extended to every passenger boarding any domestic flight. *Epperson* held that the overwhelming governmental interest in air safety, weighed against the minimal invasion of private interest implicit in the magnetometer search, answered the substantive requirement of *Terry*. In *Terry* itself the justifying interest was found in the police interest in investigating inexplicable behavior that did not amount to probable cause for arrest or search but did invite immediate investigation, coupled with the necessity for a check of the person being investigated for weapons so that the policeman could investigate in safety. The Court in *Bell* referred also to United States v. Lindsey, 3d Cir. 1971, 451 F.2d 701, which applied *Terry* to an airport search where there was neither designation as a selectee nor magnetometer activation. In *Lindsey* observation of the passenger's haste, obvious agitation and nervousness, and his use of several names, more or less inadvertently disclosed, resulted in a pat down and the discovery of foil wrapped packages of heroin. *Lindsey* is directly within *Terry* no matter how strictly that case is construed.

■■ Airport "search" cases hardly invoke Fourth Amendment standards. The context is not basically a citizen-to-government context, and invocation of the Fourth Amendment appears as an almost gratuitous consequence of the presence in the background of governmental air safety regulation and of the governmental provision at airports of peace officers to apprehend people found actually committing or attempting crimes. The real problem is to assure the safe transit of private persons on privately owned aircraft. Surveillance and search of persons boarding aircraft arises out of the united interests of the

air carriers, aircraft personnel, and passengers, constituting an interrelated group mutually interested in their own safe passage by air, in seeing that no one boards the aircraft with the will and means to hijack it or to destroy it in flight. The antecedent to an insistence upon governmental compliance with Fourth Amendment standards is wholly lacking. The persons interested in the flight, carrier, crew and passengers, are not seeking to detect crime or to prevent crime in the public interest. Their interest, absolute and unqualified, is in safe flight and in doing what is minimally essential for safe flight. They would not board the plane if not confident that it had been given pre-flight inspection by competent ground crews, and, for exactly the same reason, would not board the plane without assurance that flight safety had been secured as against those who are to be aboard the plane, themselves included. Chief Judge Friendly may not have gone that far in *Bell*, although it is arguable that he has, however gently, implied that in saying, 464 F.2d at 675, "When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air" (emphasis in original; footnote reference omitted). In this view of it, the profile and magnetometer checks are not circumstances substituting for probable cause authorizing a Fourth Amendment search for evidence of criminality or for contraband but rather are coarse-screening devices adopted as a convenient substitute for total search of all passengers, flight personnel and baggage. The profile and magnetometer except most passengers from the total search that common sense otherwise requires and that air safety

really recommends, upon the calculation that if only those both within the profile, positive on the magnetometer, and unsatisfactorily responsive to interview are stopped and thoroughly searched, safe passage will be secured for all those boarding the flight. Those not cleared for boarding are searched not as under positive suspicion or as indicated by probable cause but simply because they are the only ones of all those originally and still notionally subject to search who have not been cleared for boarding through an unobtrusive but real conceptual pat-down.

 Absent then, circumstances arousing suspicion about the conduct of any particular search that follows on activation of the magnetometer or on selection by the other screening devices, it is difficult to see how a question respecting invasion of an interest protected by the Fourth Amendment can be thought to arise in the airport search. A lively police mind might see in the existence of the airport situation an occasion to exploit with searches unrelated to flight safety—although the opportunity to search is not created or controlled by the law enforcement authorities nor is the attendance of the prospective passengers contrived by the police. Any indication of an exploitation of the airport occasion for other than flight safety purposes would warrant inquiry and the suppression of evidence that could with any degree of confidence be attributed to that kind of conduct. But, as always, the self-discovered crime, and that, really, is what airport surveillance elicits, does not attract immunity because it falls into police hands as an unsought by-product of privileged activities. But while the Government very freely agreed that in the present case it had the burden of proving the reasonableness of the search, it may be questioned whether the Government would have the burden of proving—a negative really—that it had not for some purpose other than flight safety exploited the airport occasion to track down heroin couriers or others. Rather it would ap-

44

pear that the defense must at least come forward with evidence indicating that there may have been or was such an exploitation of the occasion.

■ The facts as found do not produce a suspicion of that in the present case. But the point is not without importance here because of the baffling effect of the erroneous classification and because of the complete failure of the effort to locate evidence of the genesis of the mistake in classifying the defendant as a selectee. But the conclusion reached is that the defendant is the one who must come forward with evidence indicating that he was not searched as a person not cleared for boarding, where, as here, there were positive circumstances inducing the search. There were here, quite apart from the mistaken profile classification—which can, perhaps must, be laid out of view—the activation of the magnetometer, and the observed conduct, plus the statement that the defendant was not travelling on a ticket in his own name. The occasion of search being present, the marshals were not under any duty to stop short of a thorough search. The fact that they might have been satisfied to stop at the knife does not mean that they were under a duty to stop at that point even if, as is likely, they thought that the knife alone sufficed to explain the activation of the magnetometer. They were free to complete the search since, in popular report and public suspicion, the hijack threat includes not simply conventional weapons but bomb threats and other alternatives to the conventional pistol or grenade.

The Court in deciding *Bell* did not refer to Adams v. Williams, 1972, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, although that case cannot be thought to have changed the analysis of *Terry*, and certainly cannot be regarded as altering the balancing of the public interest in police inquiry against the private interest in freedom from search on an occasion when inquiry is indicated.

It is concluded, therefore, that the motion to suppress must be denied. It is accordingly

Ordered that the motion of the defendant to suppress the use in evidence of the narcotics seized on April 7, 1972, at LaGuardia Airport is denied.