UNITED STATES of America, Plaintiff,

v.

Pasquale POLITANO, William C. Stanbridge, Denise Smith, Defendants.

No. CR–79–00128.

United States District Court,
W. D. New York.

June 6, 1980.

458

Richard J. Arcara, U. S. Atty., Buffalo, N. Y. (Richard D. Endler and Barry J. Finkelstein, Dept. of Justice Attys., Buffalo, N. Y., of counsel), for the Government.

George P. Doyle, Buffalo, N. Y., for defendant William C. Stanbridge.

Pack, Grashow, Palmer, Greenman, Hurley & Ball, Buffalo, N. Y. (Herbert L. Greenman, Buffalo, N. Y., of counsel), for defendant Denise Smith.

CURTIN, Chief Judge.

On April 15, 1980, the court issued an order briefly summarizing the court's decision on the defendant Denise Smith's motion to dismiss and indicating that a decision would follow which would explain the result. In the meantime, counsel for the defendant Denise Smith made a motion for reconsideration. As my explanatory decision reveals, I believe this motion has merit and that the order of April 15 should be modified. As a result, the order of the court is as follows: (1) all evidence obtained in connection with the search at the airport security checkpoint is suppressed; (2) all evidence obtained during the investigative stop and in the search of defendant's bag in the airport office is suppressed; and (3) all evidence obtained in the search of her automobile on the day of her arrest is suppressed. The reasons for this order are explained below.

Prior to June 2, 1979, agents of the United States Drug Enforcement Administration ["DEA"] had been conducting an investigation of the suspected narcotics activities of Pasquale Politano for some time. Shortly before June 2, arrangements were made by DEA agents for an undercover informant and agent to purchase eight ounces of heroin from Politano at his residence on that day. Other agents conducted a simultaneous surveillance in the vicinity of his home at 234 Prospect Avenue, Buffalo, New York. Late in the afternoon of June 2, the agents observed Mrs. Politano arrive at the home with a male and a white female who was later identified as the defendant Denise Smith. Shortly thereafter, the agents learned that contact had been made between the undercover agents and Politano and that the sale of heroin would take place that afternoon. The undercover agents proceeded to the Politano residence. At approximately 5:20 p. m., these agents were observed leaving it. A short time later, the female and male individuals who had arrived earlier with Mrs. Politano were observed leaving with Politano. Politano drove them to the Buffalo International Airport. DEA agents followed them.

Upon arrival at the airport, one of the agents talked to the United Airlines and American Airlines security personnel and told them that a narcotics investigation was in progress. He gave them a description of the two individuals in question and asked that, if possible, they should obtain identification from them. He told them that one may be carrying a large sum of money, and that it would be helpful if the security personnel could get a serial number from the money. The agents also contacted the Cheektowaga police officers on duty and gave them the same information and asked them if they could get identification. This request was passed on to Officer Eugene Leahy.

After defendant Smith went to the ticket counter, the agent learned from the airline employee that she was traveling under the name of "M. Gagliardi," and was leaving on a flight to New York. The ticket also

showed that she had arrived in Buffalo on a flight from New York earlier that same afternoon. While defendant Smith and her male companion, who was later identified as the defendant William C. Stanbridge, were waiting for the flight, the agents noticed that she changed her dress and hairstyle. At about 6:30 p. m., Agent Peterson, not then on the scene, was advised by the other DEA agents that eight ounces of heroin had been purchased from Politano for about $44,000 and that the individuals who had been in the Politano home immediately before the sale were now at the Buffalo Airport ready to travel to New York on the 7:20 p. m. American Airlines flight. Peterson then proceeded to the airport.

In the meantime, the male person who had been followed to the airport went through the airport security checkpoint first. When he did so, the magnetometer rang but, after a hand scan by Officer Leahy, the man was allowed to proceed to the departure gate because, according to the testimony of the officer, he felt that he had no basis for requesting further identification. When defendant Smith's shoulder bag passed through the X-ray device, one of the operators noticed a "large mass" in the bottom of her shoulder bag. Smith was advised that the bag would have to be opened if she wanted to board the plane. Defendant Smith made no reply but simply nodded affirmatively. The reason since given for examining the bag further was that it was an unidentified mass, that it had the shape and density of a plastic explosive, and that the operator was instructed to check all unidentifiable objects further. Upon opening and searching the bag, a large roll of money was observed at the bottom. When Smith was asked why she was carrying such a large amount of money, she said that it was a personal matter. She was referred by Susan Helwig, one of the airport security personnel, to Officer Leahy, who was standing close by.

The officer and defendant Smith went to a table which was off to the side, and Leahy asked her several questions about the money. He explained that when individuals go through the security area carrying large sums of money, this same procedure or questioning is followed. Defendant Smith told Leahy that the bag contained about $30,000 and that the money was an inheritance. She also told him her name was Maria Gagliardi and that her birthdate was May 31, 1951. She said that she was traveling alone and had no identification with her, and she refused Leahy's offer to escort her to the plane and to call ahead to LaGuardia to have a security person assist her when she departed from the plane. When she told him that she wanted to leave, she was allowed to proceed to the boarding gate.

Helwig and Leahy told the DEA agents what information they had obtained. It was later decided that Agent Peterson would board the plane to attempt to get further information from defendant Smith. Peterson was dressed casually and was not in uniform. When he reached her seat in the plane, Peterson identified himself and asked her if she would accompany him off the plane while he asked her some brief questions. As they were proceeding down the jetway, he showed her his DEA credentials. When she asked whether she was under arrest, he told her that she was not. He said that he just wanted to ask her some questions about the money and that, in view of the crowded conditions where they were, it would be better if they stepped into a nearby room in the terminal. He assured her that she would not miss her flight, and they went to a room just off of the jetpath. It was a small room and, in addition to Peterson and Smith, there were two other DEA agents present. She told Peterson the money was an inheritance, that her name was Maria Gagliardi, that she lived in New Jersey, and that her birthdate was May 31, 1951. She refused to tell him from whom she had inherited the money, and told him that it was none of his business. He asked her if he could look at the money. She dumped the contents of her purse on the table, and Peterson noted that the money was in denominations of $20, $50, and $100 bills and was wrapped in eight to ten bundles. He wrote down the serial numbers of

some of the bills and noted that there were white pieces of paper affixed to some of the bundles. The money was returned to the bag, and defendant Smith was permitted to go back to the plane after about a five-minute meeting with the agents. Later, when the serial numbers of the bills in the possession of Smith were compared with the serial numbers of the bills that the DEA informant had passed to Politano, it was found that the numbers corresponded.

The next event requiring discussion occurred on July 8, 1979, when Denise Smith and others were arrested at 234 Prospect Avenue in Buffalo by DEA agents and officers of the Buffalo and Amherst, New York Police Departments. The arrest occurred after DEA agents had obtained warrants for the arrest of Smith and the others. She was arrested at about 1:00 p. m. Agent Iwinski of the DEA testified that she was advised of her constitutional rights at the time of her arrest. After making the arrests, the agents conducted a search of the Politano house pursuant to a search warrant. During this period, or until approximately 3:30 p. m., the defendant was handcuffed and seated at the kitchen table with the other persons who had been arrested, Mrs. Politano and William Stanbridge. Agent Iwinski testified that at about 3:30 p. m. he approached Denise Smith and the other persons at the kitchen table and asked them who owned a green Volkswagen with New Jersey license plates. Denise Smith stated that it was hers. Iwinski testified that in answer to his question as to the vehicle registration, the defendant replied that it was in the glove compartment. Iwinski then obtained a consent to search form and showed it to Denise Smith. Iwinski testified that he asked her whether he could search her car, that he told her she was under no obligation to permit the search, and that he asked her whether she understood her rights. He further testified that the defendant stated, "Well, you are going to do it anyway, aren't you," to which he replied, "No, that's not the question I posed." According to Iwinski's testimony, he then had her read the consent form, after which she signed the form. The re-

sulting search of the defendant's car turned up a plastic bag containing heroin, which was found under the dashboard.

Denise Smith's testimony reveals additional circumstances relevant to the signing of the consent form. She testified that during the time she was under arrest in the Politano residence she was extremely scared, enough so that she urinated in her pants. She also testified that during the time when Agent Iwinski had gone to obtain the form, she talked with Agent Teresi. According to her, Teresi was directing other officers to prepare to take those arrested, including herself, downtown to the holding center, but to leave Mrs. Politano at the Politano residence until a relative arrived. Smith stated that, because she was frightened and did not want to go downtown by herself, she asked Teresi whether she could stay and wait until Mrs. Politano went down. Agent Teresi responded, "Why should I do you any favors, you are not helping us at all." Smith testified that when she asked him what he expected her to do, he said, "Why don't you just sign the consent form?" She asked, "What if I don't sign the consent form," to which Teresi replied, "We would search it anyway." The defendant also testified that Teresi told her that if she signed the form he would see what he could do about her staying with Mrs. Politano until she went downtown to the holding center. She testified, moreover, that when Iwinski came back with the consent form she signed it, but felt she had no choice but to sign it. She stated that she believed that the extent of the search was to be limited to the glove compartment to obtain her vehicle registration. Teresi did not testify and her testimony about her conversation with him stands uncontradicted. I see no reason not to accept it.

## AIRPORT SEARCHES

Defendant Smith's motion to suppress physical and testimonial evidence obtained by the DEA agents at the Buffalo airport can be summarized briefly. First, the defendant claims that the search of her bag at the security checkpoint violated her fourth amendment rights because of the sugges-

tive prior involvement of the DEA agents with the participating airport security personnel. Therefore, it is said that any evidence and information obtained or statements made as a result of that search must be suppressed. Second, the defendant contends that the later search of her bag, after she was taken from the airplane, was also an unconstitutional search. Relying on the Supreme Court's recent decision in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the defendant ·argues that this search is not authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because it is not within the narrow exception to the general requirement of probable cause pronounced in *Terry*, which permits a limited search or pat-down only for weapons. For any search to be justified in this case, therefore, defendant claims it must be based on probable cause to arrest the defendant. Defendant argues that probable cause was lacking in this case because the information conveyed by the airport security personnel to the DEA agents, confirming the fact that she was carrying a large amount of money, cannot be included in such a determination because it must be suppressed. In conjunction with this argument, defendant contends that even if probable cause existed, a warrant to search her bag was required.

▮ Looking first to defendant's claim as to the checkpoint search, the burden is on the government to prove the reasonableness of the search under fourth amendment standards. The airport search which follows the triggering of a device for screening passengers and baggage is ordinarily justified by the public's paramount concern for air safety. The great danger to life and property which hijacking poses to society meets the test of reasonableness for a search if it is "conducted in good faith for the purpose of preventing hijacking . . ." *United States v. Bell*, 464 F.2d 667, 675 (2d Cir. 1972); *United States v. Mitchell*, 352 F.Supp. 38, 42–43 (E.D.N.Y.1972), *aff'd*

*mem.*, 486 F.2d 1397 (2d Cir. 1973). The existence of the airport security checkpoint, however, cannot be exploited by government agents for purposes other than flight safety. The warrantless intrusion into the privacy of airline passengers can be justified only by the limited purpose of air safety and this justification and its legitimacy would be undermined if government law enforcement agents were allowed to abuse the airport search procedure. The court agrees with the statement in *Mitchell, supra*, at 43, that "[a]ny indication of any exploitation of the airport occasion for other than flight safety purposes would warrant inquiry and suppression of evidence that could with any degree of confidence be attributed to that kind of conduct." *See United States v. Scott*, 406 F.Supp. 443, .444 (E.D.Mich.1976).[1]

▮ In this case the court believes that there was inexcusable exploitation of the airport security occasion. The government does not contest that a DEA agent requested the assistance of both the airport security personnel and the Cheektowaga police: he requested that they obtain identification from Denise Smith and her male companion and obtain the serial numbers from the money which he suspected was being carried by one of them. Such advance warning with respect to a particular person inevitably would influence the judgment of the security personnel in deciding whether or not to search a passenger.

The government contends, however, that the security personnel had an independent basis to search Denise Smith because of the large, unidentifiable mass in her shoulder bag which appeared on the X-ray scanning device at the checkpoint. In making this argument, the government relies on *Scott, supra*. In that case, the court declined to apply a per se rule invalidating all searches by security personnel conducted subsequent to warnings by officers investigating crimes

---

1. This statement, of course, is not meant to comment on the widespread use in prosecutions not relating to the safety of airline passengers, *see, e. g., Mitchell, supra*, of evidence *unsought* by law enforcement agencies, but obtained merely incident to the airport boarding search.

collateral to airport security. *Id.*, at 445. Rather, the court, in order to sustain the constitutionality of the search, would inquire into whether there was "an independent and adequate basis for the security search in its own right." *Id.* Given the clear responsibility of security personnel for preventing weapons or similar devices from being carried aboard airplanes, this approach has merit. Nonetheless, in this case the "independent basis" for the search proffered by the government is not sufficient. Such a basis, when abuse of the limited purpose of the security checkpoint has been shown, must be fairly compelling. The fact that there was a large, unidentifiable mass at the bottom of defendant's bag is not an adequate reason to search in light of the inevitable influence caused by the DEA agent's request for assistance. Therefore, defendant's motion to suppress all evidence obtained in connection with the search at the security checkpoint is granted.

■ The defendant also has made a motion to suppress all evidence obtained in connection with her questioning in the room at the airport and the related search of her handbag. The Second Circuit recently has had occasion to consider in detail the legal standards to be applied where law enforcement personnel conduct an investigative stop; both *Terry v. Ohio, supra,* and the Supreme Court's most recent decision on the issue, *Dunaway v. New York, supra,* were discussed in *United States v. Vasquez,* 612 F.2d 1338 (2d Cir. 1979). The two concurring judges in *Vasquez* concluded that the *Dunaway* decision did not limit *Terry* to its facts, which would have confined investigative stops to those in connection with a protective search for weapons. Rather, the court concluded that *Terry* has continuing validity at least to the extent of permitting minimally intrusive investigatory stops. *Id.*, at 1342, 1348. Such stops are permitted if the intrusion on the person is not extensive and where the law enforcement officials can point to specific and articulable facts from which one could reasonably suspect that a person is engaged in criminal activity. *Id.*, at 1345; *see Terry, supra,* 392 U.S., at 21, 88 S.Ct., at 1879. When, however, a seizure entails "the kind of intrusion involved in an arrest," even if technically short of an arrest, it must be based upon probable cause to satisfy the reasonableness standard of the fourth amendment. *Vasquez, supra,* at 1341; *see Dunaway, supra,* 442 U.S., at 212, 216, 99 S.Ct., at 2256, 2258.[2]

■ The investigatory stop authorized by *Terry,* though, does not permit a general search of the suspect; only a protective search for weapons is permitted. *Dunaway, supra,* at 210, 99 S.Ct., at 2255. Any other search made in connection with such a stop must be based on consent or probable cause.

■ In applying the above legal principles to this case, the court must also keep in mind the instructions of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Supreme Court

---

**2.** The Supreme Court has recently decided, somewhat inconclusively, the first "airport stop" case to reach it. *United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497, (1980), *rev'g,* 596 F.2d 706 (6th Cir. 1979) (en banc). This decision does not directly affect the determination of this case. The principal issue in *Mendenhall* was whether or not DEA agents validly stopped the defendant in the airport. Although the majority was split as to whether the defendant was "seized" within the meaning of the fourth amendment, all agreed that the fourth amendment was not violated when the DEA agents, utilizing their "drug courier profile" as the basis for their suspicion, stopped and questioned the defendant. The court also held that after a constitutional stop of the defendant, her accompanying the DEA agents to their airport office did not in any way "infect" the subsequent search of her person where there is a finding that she voluntarily accompanied the agents. *Id.*, at ——, 100 S.Ct. at 1879. Her subsequent consent to be searched was found to be voluntary.

The facts of our case require a different approach. There was no illegal activity by government officers in *Mendenhall* which preceded the investigative stop and later search of the defendant, as there is in the instant case. Moreover, even when one analyzes the issue as to whether Agent Peterson properly "stopped" Denise Smith, the factors purportedly justifying the stop are not analogous at all to the drug courier profile characteristics, nor is the context the same.

noted initially that the exclusionary rule prohibits the government's use of evidence against a defendant which is the indirect as well as direct result of an unlawful search. *See Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In determining whether evidence is "fruit of the poisonous tree," the test is not whether the evidence "would not have come to light but for the illegal actions of the police." *Wong Sun, supra,* at 487–88, 83 S.Ct. at 417. The Court held instead that

> the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Id.,* at 488, 83 S.Ct., at 417.

As discussed above, the illegality of the search of defendant's bag at the airport checkpoint has been established. The court must determine, therefore, whether the evidence obtained by Agent Peterson during the later investigative questioning and search of defendant's bag, and objected to by the defendant as "fruit of the poisonous tree," was come at by exploitation of the prior illegal search. I find that any evidence obtained in the second search of her bag was come at by exploitation of the prior illegal search.

■■■■ This finding is based on the following reasons. The government urges as one basis for the search of Denise Smith's bag in the room at the airport, without a warrant, that she voluntarily consented to the search. This is not persuasive. Ordinarily, whether a consent to search was voluntarily given is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government bears the burden of showing that her consent was her own free choice and that her will was not overborne. *United States v. Vasquez, supra,* at 1347; *see United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976), *Schneckloth, supra,* and *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The court recognizes that the record reveals no overt coercion of the defendant by Agent Peterson or any other law enforcement personnel in the room where the questioning and search occurred. An additional factor which must be considered, however, in examining the totality of the circumstances is that the defendant was no doubt acutely conscious of the fact that her bag had already been searched once at the airport and that law enforcement officials had learned she was carrying a large amount of money in her bag. She must have assumed that her interrogator, Peterson, in asking to see the money, knew from the earlier search that she was carrying a considerable amount of cash. Given these circumstances, it would be hard to find that her consent, her dumping of the money on to the table, was the result of her free will. There could be no purpose in asserting a right to privacy over the bag, for she knew that the agents already were aware of the contents of it.

Moreover, the request by Agent Peterson to see the money could only be based upon the information obtained through the prior illegal search at the airport checkpoint by the security personnel and the Cheektowaga police officer. No basis for this request independent from that information is put forth by the government, nor is one apparent. Under all of the circumstances, I believe that *Wong Sun* applies in this case and that any purported consent by the defendant is tainted by the prior illegal search. Therefore, the government's argument that Denise Smith consented to the search of her bag must fail.

The government also contends, as a basis for the latter search, that the agents had probable cause and that exigent circumstances existed so as to excuse the procurement of a warrant. This contention also must fail.

■■■■ The testimony at the suppression hearing, as now reflected in the transcript, shows that the principal factor for Agent Peterson and the other DEA agents in de-

ciding to stop the defendant was the information they had obtained from the security personnel that she was carrying a large amount of cash. The government has argued that, if one excludes this information from all that was known by the agents, enough untainted information was known to justify not only the *Terry* investigative stop but the subsequent search of her handbag as well. The court recognizes that the agents had other information obtained during the surveillance of the Politano residence and at the airport which might justifiably raise their suspicions. However, they did not learn that Denise Smith was actually carrying a large amount of money from any source independent or separate from the prior illegal search. *See Wong Sun, supra,* 371 U.S., at 487, 83 S.Ct., at 417; *Silverthorne, supra,* 251 U.S., at 392, 40 S.Ct., at 183. On the contrary, it was that very information which triggered the stop and the subsequent search. Moreover, the stop and search were not attenuated in a temporal sense from the prior illegality so as to dissipate the taint but, rather, occurred very shortly after the checkpoint search. *See Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939). Where the government agents obtained the crucial information, which caused and guided their actions at the airport, through the gross misuse of the airport security checkpoint and the illegal search incident to it, the government's argument that it can make an after-the-fact showing of probable cause based on other information must be rejected under the circumstances of this case. The evidence obtained during the investigative stop and search in the interview room must be suppressed under *Wong Sun.*

The court finds in addition that the government has failed in any case to demonstrate probable cause. Assuming *arguendo* that enough articulable information, aside from that obtained as a result of the security search, was known so as to justify a brief, minimally intrusive stop,[3] the government has not shown sufficient facts to constitute probable cause.

■■■■■■■ To briefly restate the long-accepted definition, probable cause is more than mere suspicion. It

> exists only where "the facts and circumstances within their [the officers] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

*Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), *citing Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). When one excludes from the mix of circumstances known to the agents that the defendant actually had a large amount of money on her person, there is simply not enough facts to warrant a belief that the defendant was in the process of committing a crime. The agents certainly had reason to be suspicious; the defendant was in the Politano residence when the two undercover agents were there and at the time the heroin sale occurred, and she was driven to the airport by the target of the drug investigation a

---

3. As set forth, *supra,* if the government can point to specific and articulable facts from which one could reasonably suspect that a person is engaged in criminal activity, an investigative stop is permitted if it does not amount to an arrest. I believe that the stop here did not amount to the kind of intrusion involved in an arrest such that *Dunaway, supra,* would apply (which would require a demonstration of probable cause by the government), for the period of questioning was brief and Agent Peterson assured the defendant that she would not miss her plane and that she was not under arrest. Thus, the *Terry-Vasquez* standard for investigative stops applies.

> Applying that standard and excluding from the mix the information that Denise Smith was actually carrying a package of money, the agents knew that a drug sale had occurred at the Politano residence, that defendant had been in the residence at the time of the sale, that Politano drove her to the airport, and they had reason to believe that the heroin had been brought in from outside Buffalo and that a courier would take the proceeds of the sale out of Buffalo. Under ordinary circumstances, this would be sufficient to create the necessary suspicion to justify a *Terry* stop.

short time later. But, as the government has conceded at oral argument, these circumstances are insufficient to constitute probable cause. The government argues, though, that additional facts were obtained at the airport which when added to the circumstances observed at the Politano residence support a showing of probable cause. Specifically, the government points to the fact that one agent learned at the airline ticket counter that the defendant had only arrived in Buffalo earlier that same day and that she changed her clothes and hairstyle at the airport. These additional circumstances do not point unambiguously to criminal activity by any means and do not alter my conclusion that no showing of probable cause has been made which could support the second search of Denise Smith's shoulder bag.[4]

*CAR SEARCH*

The defendant also moves to suppress any evidence obtained as a result of the search of her car on the day she was arrested outside the Politano residence. The government argues that this motion must be denied on the grounds that Denise Smith freely and voluntarily signed a form consenting to this search. For the reasons set forth below, the defendant's motion is granted.

As discussed previously, the government has the burden of showing that, under the totality of the circumstances, a purported consent to search was freely and voluntarily given and not the result of duress or coercion, whether express or implied. *Schneckloth, supra; Vasquez, supra.* The fact that Denise Smith was in custody at the time of the purported consent cannot alone demonstrate a coerced consent to search. *Watson, supra,* 423 U.S., at 424, 96 S.Ct., at 828. Rather, the court must determine whether she signed the consent form of her own free, unconstrained choice. I find that the government has failed to carry its burden of showing that Denise Smith freely and voluntarily signed the form consenting to the search of her automobile on the day she was arrested.

In reaching this decision the court has taken into account the following factors. First, the defendant, although not in the confines of a police station, was in custody for an appreciable length of time. She was not, as in *Watson, supra,* on a public street but, on the contrary, had been handcuffed for about two hours. Second, it is evident that the defendant was very scared, a condition exemplified by her urinating in her pants. Third, the factor most important to the court is the defendant's uncontradicted testimony about her conversation with Agent Teresi prior to being confronted with the consent to search form. In the period of time when Agent Iwinski went to secure the form and, therefore, just before Iwinski told her that she could refuse to sign the waiver form, Teresi had told the defendant that they would search her car even if she did not sign the consent form. Denise Smith had expressed fear at going downtown to the holding center alone and had requested of Teresi that she be allowed to remain until Mrs. Politano could go down at the same time. Teresi took advantage of her anxiety and presented her with an option: you help us by signing the consent form and I will see what I can do. This promise, Teresi's statement that the agents would search her car whether or not she signed the consent form, and the evidence that the police custody had a severe impact on the defendant's self-control, all indicate that defendant's signing the form was not the result of her "essentially free and unconstrained choice." Giving consideration to the totality of the circumstances, I find that there was no voluntary consent to search her car. Therefore, the defendant's motion to suppress the evidence obtained as a result of that search is granted.

So ordered.

---

4. Under the circumstances, it is unnecessary to reach the issue as to whether exigent circumstances existed to excuse the lack of a warrant to search.